# EXHIBIT A

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

**,

    Petitioner,

vs.                     Case No. 19-1627E

HILLSBOROUGH COUNTY SCHOOL
BOARD,

    Respondent.

_____/

## FINAL ORDER

A final hearing was held in this case before Todd P. Resavage, an Administrative Law Judge of the Division of Administrative Hearings (DOAH), on August 29, 2019, in Tampa, Florida.

## APPEARANCES

For Petitioner:  Megan Marie Collins, Esquire
                  Disability Rights Florida
                  Times Building, Suite 640
                  1000 North Ashley Drive
                  Tampa, Florida  33602-3716

                  Ann Marie Cintron-Siegal, Esquire
                  Disability Rights Florida
                  1930 Harrison Street, Suite 104
                  Hollywood, Florida  33020

For Respondent:  LaKisha M. Kinsey-Sallis, Esquire
                  Fisher & Phillips LLP
                  Suite 2350
                  101 East Kennedy Boulevard
                  Tampa, Florida  33602

## STATEMENT OF THE ISSUES

Whether Respondent's failure to provide "home door" transportation to Petitioner deprives Petitioner of a free appropriate public education (FAPE), in violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq.; and if so, what remedy is Petitioner entitled.[1/]

## PRELIMINARY STATEMENT

Respondent received Petitioner's Request for Due Process Hearing (Complaint) on March 26, 2019.  On March 27, 2019, the Complaint was forwarded to DOAH, and assigned to the undersigned for all further proceedings.

The final hearing was originally scheduled for May 27, 2019; however, due to the parties' availability, the hearing was rescheduled for May 31, 2019, and then rescheduled again to May 14, 2019.  On May 9, 2019, the parties filed a Joint Motion to Continue Final Hearing and Hold Case in Abeyance.  Said motion was granted the following day and the matter was placed in abeyance until August 1, 2019.

On August 1, 2019, the parties filed a Joint Status Report representing that the matter had not been amicably resolved. Thereafter, a telephonic status conference was conducted on August 7, 2019, and, on August 8, 2019, the final hearing was noticed for August 29, 2019.

On August 27, 2019, the parties filed a Joint Pre-hearing Stipulation.  Pursuant to paragraph E. of the stipulation, the parties agreed to certain facts as admitted and requiring no further proof at the final hearing.  To the extent relevant, the admitted facts are adopted and incorporated herein in the Findings of Facts section below.

The final hearing was conducted, as scheduled, on August 29, 2019.  The final hearing Transcript was filed on September 18, 2019.  The identity of the witnesses and exhibits and rulings regarding each are as set forth in the Transcript.

Upon the conclusion of the final hearing, the parties stipulated that the proposed final orders would be filed on or before October 11, 2019.  Accordingly, it was agreed that the undersigned's Final Order would be issued on or before November 25, 2019.  The parties timely filed proposed final orders, which have been considered in this Final Order.

Unless otherwise indicated, all rule and statutory references are to the version in effect at the time of the alleged violations.  For stylistic convenience, the undersigned will use male pronouns in this Final Order when referring to Petitioner.  The male pronouns are neither intended, nor should be interpreted, as a reference to Petitioner's actual gender.

FINDINGS OF FACT

1.  During the 2018-2019 school year, Petitioner was a fifth-grade student at School A, a public elementary school in Respondent's school district.

2.  Petitioner had been previously determined eligible for and has received exceptional student education (ESE) services under the eligibility categories of Orthopedic Impairment and Language Impairment.  Petitioner also receives Language Therapy. In addition, Petitioner's individualized education program (IEP) reflects that he has a significant cognitive disability.

3.  Petitioner has been diagnosed with spina bifida with hydrocephalus, possesses certain visual deficits, has a neurogenic bladder, and has a ventriculo-peritoneal shunt, which allows drainage of fluid within the skull to the abdominal cavity to prevent an increase in intracranial pressure.

4.  Petitioner's mother credibly testified that Petitioner has received Occupational Therapy, Physical Therapy, and Speech Therapy since birth.  He has been required to undergo two eye surgeries.  He is incontinent of bowel and bladder, and wears diapers.

5.  Petitioner has paralysis in his lower limbs and, therefore, is reliant upon a wheelchair for mobility.  While Petitioner has the ability to propel his wheelchair, he requires adult supervision and prompting.  He also experiences anxiety or

hesitancy in propelling the wheelchair long distances, over separations in the sidewalks, and changes in elevation.

6. One of Petitioner's physicians, Lisa Anne Wildcatt, M.D., credibly testified that due to his cognitive issues, Petitioner, although 11 years old, presents cognitively as a typical 5 year old. He is unable to express his wants and needs in an emergency situation. Dr. Wildcatt also credibly testified that, due to his medical conditions, Petitioner cannot appropriately manage his core temperature, and, therefore requires a stable climate and must be monitored.

7. Petitioner first enrolled at School A in pre-kindergarten. At that time, Petitioner's mother lived in a single-family residence, on a two-lane public road. Since his initial enrollment, Petitioner has required specialized transportation to and from school. With respect to the location of the bus stop, Petitioner's mother credibly testified that the school bus picked up Petitioner at the end of the residence driveway. Petitioner's mother pushed him in the wheelchair from the home to the end of the driveway to meet the bus, and from bus to home, upon return.

8. On April 2, 2018, an IEP meeting was conducted for Petitioner. Of relevance to this proceeding, the IEP developed at the meeting documents that he required daily specialized transportation to and from School A, due to his medical

5

equipment.  A Specialized Transportation Documentation Form (Transportation Form) completed at the meeting provides that Petitioner requires a lift in order for him to gain access to the bus, that Petitioner uses a parent-provided manually operated wheelchair, and that Petitioner requires an aide or monitor on the bus because he is unable to communicate information about himself in an emergency situation.

9.  The Transportation Form also documents that Petitioner requires adult supervision at the bus stop and that a parent or adult designee must meet Petitioner at the bus stop.  This form does not mention "home door" or "door-to-door" transportation. Indeed, the Transportation Form provides no information concerning the location of his bus stop nor is such information found in another section of Petitioner's IEP.  The Transportation Form was signed by Petitioner's mother.

10.  At the time of the April 2, 2018, IEP meeting, Petitioner remained in the aforementioned home that was not in a gated-community or located on a private road.  Based on Petitioner's address, Respondent continued to assign Petitioner a home bus stop location.

11.  On or about September 15, 2018, Petitioner's mother relocated to an apartment complex.  A brief description of the complex layout is a necessary exercise in the resolution of this matter.

12.   The apartment complex is comprised of six large buildings, essentially laid out in an east-to-west pattern.  When exiting the north side of Petitioner's apartment building, one encounters a private road, Plantation Palms Drive.  Plantation Palms Drive includes parking spaces on its north and south side, and runs the entirety of the complex.

13.   Several feet north of Plantation Palms Drive is a concrete sidewalk.  Proceeding north from the sidewalk, there is a section of grass before encountering Plantation View Avenue. When traveling east, Plantation Palms Drive, the sidewalk, and Plantation View Avenue run essentially parallel to each other and then intersect with a public road, Providence Road (runs north to south).  The intersection of Plantation View Avenue and Providence Road is approximately 800 feet from the center of Petitioner's mother's apartment building.

14.  Although Petitioner's mother relocated to the new address on or about September 15, 2018, Petitioner remained at the prior address for a few weeks with a relative, and, therefore, continued to be picked up by the bus at the end of his driveway.  Petitioner's mother (at some point in time) notified Respondent of her new address.  Petitioner was then assigned a new bus stop at the intersection of Plantation View Avenue and Providence Road.

15.   Thereafter, an IEP meeting was conducted on October 11, 2018, solely to address parental concerns regarding Petitioner's transportation.  By agreement of Petitioner's mother, the only individuals present at the meeting were Petitioner's ESE teacher, the local education agency representative, and Petitioner's mother.

16.   No changes were made to the IEP with respect to the related services section of the IEP in terms of transportation; however, the IEP team completed an updated Transportation Form. Said form provides, in pertinent part, as follows:

> [Petitioner's] parent recently moved to a new location and [his] mom is wanting to discuss [his] need for the bus to pick [him] up directly from her new address.  Mom is stating that transportation has issued [Petitioner] a bus stop that is not [his] home address.  The bus stop the transportation offers to pick up [Petitioner] is a block away and near a dangerous sign pathway . . . the IEP team agrees that [Petitioner] needs to be picked up directly from [his] home door to ensure [Petitioner's] safety.

17.   Suzette Sample, assistant director for compliance and staffing, special education, testified that the Transportation Form is "utilized to communicate to the bus drivers and to identify any training needs, to communicate to Transportation what type of bus is needed for what purpose."  Ms. Sample further testified that this document is in addition to the IEP, wherein the related service of specialized transportation is documented.

18.   Respondent contends that the Transportation Form is not properly characterized as part of the IEP, and, therefore, cannot be construed as an IEP team determination that Petitioner required "door-to-door" or "home door" transportation.

19.   To the extent Ms. Sample's testimony lends support to the position that the Transportation Form is not part of the IEP, the same is not credited.  A review of the form clearly shows that its purpose is to guide the IEP team in making a determination as to whether a student requires the related service of specialized transportation.  Indeed, the first paragraph of the form provides as follows:

> IDEA identifies special transportation as a related service for students with disabilities.  IEP teams have the responsibility of evaluating each student's unique need(s) when considering the need for special transportation and how this service impacts the provision of a free appropriate public education (FAPE) and student's safety during transport.

20.   The form then requires the IEP team to, in fact, evaluate Petitioner's unique needs with respect to specialized transportation.  In this instance, the assembled members of the IEP team did so and documented on the form his need for equipment, assistance boarding and unloading, a listing of his medical conditions or physical disabilities that require special conditions and/or monitoring, an aide or monitor and whether he requires adult supervision at the bus stop.  Additionally, the

9

IEP team documented on the Transportation Form circumstances affecting the location of the pickup and return address, and characteristics and/or needs that may impact transportation. After completing the above-listed criteria checklist, the form includes the following question to be answered by the IEP team: "BASED ON THE ABOVE INFORMATION, IS SPECIALIZED TRANSPORTATION RECOMMENDED FOR THIS STUDENT?"  Here, the assembled IEP team checked "YES."

21.   The undersigned finds that the Transportation Form is part of Petitioner's IEP and does reflect the IEP team's determination of whether the related service of transportation is required and the IEP team's determination of how that service is to be implemented.

22.   Although the IEP team agreed that Petitioner required to be picked up directly from his home door and documented this decision in the October 11, 2018, IEP, the bus stop assignment location did not formally change at that time.

23.   On January 25, 2019, an IEP meeting was again convened solely to address parental safety concerns regarding Petitioner's bus stop location.  Specifically, Petitioner's mother expressed concerns regarding the lighting, traffic, weather, navigating to the bus, and strangers.

24.   During the meeting, the IEP team presented information regarding Respondent's Transportation Department policies with

respect to private and dead-end roads, and safety.  Respondent
agreed to subsequently meet with Petitioner's mother to review
the bus stop location, observe Petitioner navigating to the bus
stop, and to address parental safety concerns.

25.  On January 29, 2019, Jamie Warrington, manager for
safety and training for the Hillsborough County Public School
Transportation Department, and Renee Rybicki, ESE transportation
liaison, met Petitioner and his mother at their residence to
observe Petitioner traveling from the residence to the Plantation
View Avenue and Providence Road bus stop location.

26.  During the observation, Mr. Warrington and Ms. Rybicki
observed that the bus driver was not picking Petitioner up at the
assigned stop, but rather at the first entrance to the apartment
complex on Plantation View Avenue.  It was discerned that the bus
driver had unofficially altered the location at the request of
Petitioner's mother.  The distance from the residence to the
unofficial new pick up location was merely 253 feet.

27.  Additional observations and recommendations were
memorialized in a Bus Stop Change/Safety Review Request form.
Those observations and recommendations include, in pertinent
part, as follows:

> This roadway is private.  It was also noticed
> that two (2) lamp posts were not lit, and
> Ms. Rybicki recommended to the parent to
> discuss replacement with the complex
> management.  It is my recommendation that the

> bus stop remain at the current location for
> safety reasons, and that the Transportation
> Department will pursue obtaining a Hold
> Harmless Agreement from the roadway
> owner. . . .  During my visit, the student
> was able to successfully access the stop
> location, however did require assistance from
> the parent to navigate the speed bump.  The
> stop location is located as close as possible
> to the student address.  The bus cannot go
> into the parking lot, as requested by the
> parent, as outlined by district policy.  The
> student is accompanied by [his] parent to and
> from the bus stop location.

28.  On March 7, 2019, an IEP meeting was conducted to discuss the results of the observation, address transportation concerns, and revise the IEP, if necessary.  The Transportation Department representatives shared the results of the January 29, 2019, meeting and made several recommendations.  To minimize the time Petitioner is exposed to the elements, the IEP team made the practical recommendation that Petitioner's mother wait until the bus is first observed going down the road prior to exiting the residence.

29.  During this meeting, the school based members of the IEP team agreed that a revised bus stop was appropriate to meet Petitioner's unique needs.  Accordingly, the IEP team completed an updated Transportation Form.  Said form included the following revised language, "[Petitioner] requires a stop location in close proximity to [his] home."

30.   It is undisputed that, at all times relevant to Petitioner's Complaint, Petitioner received daily specialized transportation to and from School A.

CONCLUSIONS OF LAW

31.   DOAH has jurisdiction over the subject matter of this proceeding and the parties thereto pursuant to sections 1003.57(1)(b) and 1003.5715(5), Florida Statutes, and Florida Administrative Code Rule 6A-6.03311(9)(u).

32.   Petitioner bears the burden of proof with respect to each of the claims raised in the Complaint.   Schaffer v. Weast, 546 U.S. 49, 62 (2005).

33.   In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them FAPE that emphasized special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."   20 U.S.C. § 1400(d)(1)(A); Phillip C. v. Jefferson Cnty. Bd. of Educ., 701 F.3d 691, 694 (11th Cir. 2012).   The statute was intended to address the inadequate educational services offered to children with disabilities and to combat the exclusion of such children from the public school system.   20 U.S.C. § 1400(c)(2)(A)-(B).   To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's

13

procedural and substantive requirements.  Doe v. Ala. State Dep't of Educ., 915 F.2d 651, 654 (11th Cir. 1990).

34.  Local school systems must satisfy the IDEA's substantive requirements by providing all eligible students with a FAPE, which is defined as:

> Special education services that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).

35.  "Special education," as that term is used in the IDEA, is defined as:

> [S]pecially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including--
>
> (A)  instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings. . . .

20 U.S.C. § 1401(29).

36.  The IDEA and its attendant regulations also explicitly guarantee the provision of "related services," defined as "transportation . . . and other supportive services as are required to assist a child with a disability to benefit from

special education."   20 U.S.C. § 1401(26)(A); 34 C.F.R.
§ 300.34(a).

37.   The components of FAPE are recorded in an IEP, which,
among other things, identifies the child's "present levels of
academic achievement and functional performance"; establishes
measurable annual goals; addresses the services and
accommodations to be provided to the child, and whether the child
will attend mainstream classes; and specifies the measurement
tools and periodic reports that will be used to evaluate the
child's progress.   20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R.
§ 300.320.   "Not less frequently than annually," the IEP team
must review and, as appropriate, revise the IEP.   20 U.S.C.
§ 1414(d)(4)(A)(i).   A student's need for related services
(including transportation) is determined on an individual basis
as part of the IEP process.   See 34 C.F.R. § 300.320(a)(4).

38.   It is undisputed by the parties that Petitioner
requires the related service of transportation to permit him to
benefit from special education, and his IEPs document the same.
The pertinent issue in this matter is where Respondent's
transportation obligation begins and ends.

39.   The IDEA's implementing regulations clarify that
transportation includes:   (1) travel to and from schools and
between schools; (2) travel in and around school buildings; and
(3) specialized equipment (such as special or adapted buses,

15

lifts, and ramps), if required to provide special transportation for a child with a disability.  34 C.F.R. § 300.34(c)(16). Neither the IDEA nor its regulations, however, specify at what location a school district's responsibility to transport students with disabilities begins and ends.  Thus, states may prescribe the extent of this obligation on a case-by-case basis while considering the unique needs of the specific student.

40.  Section 1006.21(1), Florida Statutes, entitled "Duties of district school superintendent and district school board regarding transportation," provides as follows:

> The district school superintendent shall ascertain which students should be transported to school or to school activities, determine the most effective arrangement of transportation routes to accommodate these students; recommend such routing to the district school board; recommend plans and procedures for providing facilities for the economical and safe transportation of students; recommend such rules as may be necessary and see that all rules relating to the transportation of students approved by the district school board, as well as rules of the State Board of Education, are properly carried into effect, as prescribed in this chapter.

41.  The Florida Department of Education has, in turn, promulgated rules concerning student transportation.  Florida Administrative Code Rule 6A-3.0121, entitled "Responsibility of School District and parents or Guardians for Students Who Are

Transported at Public Expense," provides, in pertinent part, as

follows:

> (1)  The school district shall determine
> safety measures to be used in the
> transportation of students, such as the
> designation of routes, bus turning areas,
> student stop locations, and the method of
> securement or positioning of students with
> special needs.

> (2)  The school district shall exercise
> additional specific powers and
> responsibilities as follows:

> \* \* \*

> (c)  The district shall inform parents,
> guardians, and students at least annually in
> writing of their responsibilities and related
> district policies as follows:

> 1.  To ensure the safe travel of their
> students during the portions of each trip to
> and from school and home when the students
> are not under the custody and control of the
> school district, including during each trip
> to and from home and the assigned bus stop
> when the school district provides bus
> transportation.

> \* \* \*

> 3.  To ensure students are aware of and
> follow the district's adopted code of student
> conduct while the students are at school bus
> stops and to provide necessary supervision
> during times when the bus is not present.

> 4.  To ensure that, when the physical
> disability of the student renders the student
> unable to get on and off the bus without
> assistance, the parent or guardian provides
> the necessary assistance to help the student
> get on and off at the bus stop, as required

by district policy or the student's
individual educational plan.

42.  In compliance with rule 6A-3.0121, Respondent's Specialized Transportation Handbook provides parents with a source of information that addresses responsibilities and concerns related to specialized transportation services for students served in ESE.  The handbook sets forth Respondent's "procedures" to "facilitate safe and efficient transportation for students with disabilities."  Of relevance to this proceeding, the handbook provides the following:

**Pick-Up/Drop-Off:**

Curb-to-Curb Service:

Under most conditions, specialized transportation provides curb-to-curb service for students with disabilities.  This means that the buses will pick-up/drop-off at the curb in a safe location relative to the student's residence of record or provider as appropriate.

* * *

Due to road conditions (dead end roadways, cul-de-sacs, condominium/townhouse/apartment complexes, dirt or gravel roadways, or narrow roadways), it may be necessary to place the pick-up/drop-off site at a safe location away from the home or daycare keeping the bus on public roads.

Every effort will be made to have the bus stop as close as possible to the home or daycare.

18

> The bus driver or attendant is not
> responsible for escorting the student to or
> from the home and/or the school.
>
>         * * *
>
> **Loading/Unloading:**
>
> Private Driveways and Parking Lots:
>
> Buses do not use driveways or parking lots as
> pick-up/drop-off points.
>
>         * * *
>
> Property managers and Homeowner Associations,
> on occasion, deny school buses access to
> their property.  In these cases the pick-
> up/drop-off place will be at a safe location
> closest to the entrance of the property.

43.  Thus, parents (including those of ESE students) must ensure the safe travel of their students during each trip to and from home and the assigned bus stop, which will be at a safe public location as close as possible to the student's residence.

44.  Against this framework, Petitioner's claims are addressed.  In resolving the stipulated issue, an analysis of both the content and the implementation of Petitioner's IEPs are required.

<u>IEP Design/Content:</u>

45.  Petitioner's Complaint is properly construed as alleging that Respondent failed to develop an appropriate IEP with respect to the related service of specialized transportation at the March 7, 2019, IEP meeting.  "The IEP is 'the centerpiece

of the statute's education delivery system for disabled

children.'" Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S.

Ct. 988, 994 (2017)(quoting Honig v. Doe, 108 S. Ct. 592 (1988)).

"The IEP is the means by which special education and related

services are 'tailored to the unique needs' of a particular

child." Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch.

Dist. v. Rowley, 458 U.S. 176, 181 (1982)).

46. In Rowley, the Supreme Court held that a two-part

inquiry must be undertaken in determining whether a local school

system has provided a child with FAPE.  As an initial matter, it

is necessary to examine whether the school system has complied

with the IDEA's procedural requirements. Rowley, 458 U.S. at

206, 207.  A procedural error does not automatically result in a

denial of FAPE. See G.C. v. Muscogee Cnty. Dist., 668 F.3d 1258,

1270 (11th Cir. 2012).  Instead, FAPE is denied only if the

procedural flaw impeded the child's right to FAPE, significantly

infringed the parents' opportunity to participate in the

decision-making process, or caused an actual deprivation of

educational benefits. Winkelman v. Parma City Sch. Dist., 550

U.S. 516, 525, 526 (2007).  Here, Petitioner does not allege any

procedural violations.

47. Pursuant to the second step of the Rowley test, it must

be determined if the IEP developed pursuant to the IDEA is

reasonably calculated to enable the child to receive "educational benefits." Rowley, 458 U.S. at 206, 207.  Recently, in Endrew F., the Supreme Court addressed the "more difficult problem" of determining a standard for determining "when handicapped children are receiving sufficient educational benefits to satisfy the requirements of the Act." Endrew F., 13 S. Ct. at 993.  In doing so, the Court held that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id. at 999. As discussed in Endrew F., "[t]he 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials," and that "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id. (emphasis in original).

48.  Additionally, deference should be accorded to the reasonable opinions of the professional educators who helped develop an IEP.  See Endrew F., 13 S. Ct. at 1001 ("This absence of a bright-line rule, however, should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review" and explaining that "deference is based on the

application of expertise and the exercise of judgment by school authorities.").

49.  Here, the undersigned concludes that Petitioner failed to present sufficient evidence to establish that the IEP developed on March 7, 2019, with respect to the related service of transportation, was not reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.  To the contrary, the evidence established that the revised bus stop was located only 253 feet from Petitioner's apartment residence.  The undersigned concludes that the bus stop location was in a safe location and assigned to the closest entrance to the apartment complex property.

50.  Petitioner failed to present any evidence that Petitioner's mother could not continue to assist and supervise Petitioner while traveling to and from the stop and while waiting for the bus to arrive.  Petitioner presented no evidence to establish that Petitioner suffered any adverse health consequences as a result of his exposure to the elements while awaiting the bus or returning from the bus stop to home. Finally, Petitioner failed to present evidence that, on any occasion, Petitioner was precluded or hampered from utilizing or accessing the specialized transportation that is necessary for him to enjoy the benefits of his special education.  Given the unique facts and circumstances here, the IEP developed on

March 7, 2019, which provided Petitioner a bus stop location in a

safe location and as close as possible to his home (when

considering that the residence was located on a private road) was

appropriate.

IEP Implementation:

51.   Petitioner's Complaint is further construed as alleging

that while the IEP developed for Petitioner on October 11, 2018,

clears the IDEA's substantive threshold; Respondent did not

properly put the plan into action or "implement" the same from

October 12, 2018, through March 6, 2019.

52.   In L.J. v. Sch. Bd., 927 F.3d 1203 (11th Cir. 2019),

the Eleventh Circuit Court of Appeals confronted, for the first

time, the standard for claimants to prevail in a "failure-to-

implement case."   The court concluded that "a material deviation

from the plan violates the [IDEA]."   L.J., 927 F.3d at 1206.   The

L.J. court expanded upon this conclusion as follows:

> Confronting this issue for the first time
> ourselves, we concluded that to prevail in a
> failure-to-implement case, a plaintiff must
> demonstrate that the school has materially
> failed to implement a child's IEP.   And to do
> that, the plaintiff must prove more than a
> minor or technical gap between the plan and
> reality; de minimis shortfalls are not
> enough.   A material implementation failure
> occurs only when a school has failed to
> implement substantial or significant
> provisions of a child's IEP.

Id. at 1211.

23

53.   While declining to map out every detail of the implementation standard, the court did "lay down a few principles to guide the analysis." Id. at 1214.  To begin, the court provided that the focus in implementation cases should be on "the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld." Id. (external citations omitted).  "The task for reviewing courts is to compare the services that are actually delivered to the services described in the IEP itself."  In turn, "courts must consider implementation failures both quantitatively and qualitatively to determine how much was withheld and how important the withheld services were in view of the IEP as a whole." Id. (emphasis in original).

54.   Additionally, the L.J. court noted that the analysis must consider implementation as a whole:

> We also note that courts should consider
> implementation as a whole in light of the
> IEP's overall goals.  That means that
> reviewing courts must consider the cumulative
> impact of multiple implementation failures
> when those failures, though minor in
> isolation, conspire to amount to something
> more.  In an implementation case, the
> question is not whether the school has
> materially failed to implement an individual
> provision in isolation, but rather whether
> the school has materially failed to implement
> the IEP as a whole.

Id. at 1215.

55.   It is undisputed that Petitioner required the related service of specialized transportation to access his education. It is further undisputed that Petitioner's IEPs documented the same.  That the related service of specialized transportation was provided to Petitioner at all times relevant to this proceeding, is also undisputed.

56.   The undersigned concludes that Respondent failed to implement the bus stop location component of the related service of specialized transportation, as set forth in the October 2018 IEP, from October 11, 2018, through March 7, 2019.  As noted above in the Findings of Fact, the IEP team agreed that Petitioner should be picked up directly from his home door to ensure his safety.  This did not occur.

57.   Although Respondent failed to implement this component of the IEP, the undersigned concludes that the same was not a material deviation from that plan resulting in a violation of the IDEA.  The de minimis locational deviation from the plan neither deprived Petitioner of the related service of specialized transportation nor precluded him from receiving the benefit of specially designed instruction.  Accordingly, as there was not a material deviation from the IEP, Petitioner has failed to establish a substantive violation of the IDEA.[2/]

ORDER

Based on the foregoing Findings of Fact and Conclusions of
Law, it is ORDERED that Petitioner failed to satisfy his burden
of proof with respect to the claims asserted in Petitioner's
Complaint.  Petitioner's Complaint is denied in all aspects.

DONE AND ORDERED this 15th day of November, 2019, in
Tallahassee, Leon County, Florida.

_____
TODD P. RESAVAGE
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida   32399-3060
(850) 488-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 15th day of November, 2019.

ENDNOTES

1/  Pursuant to the parties' Joint Pre-Hearing Stipulation, the
parties have stipulated to the issue and that "home door"
transportation means "transportation that picks up and drops the
Petitioner off directly in front of the door to Petitioner's home
and does not require Petitioner to navigate to a bus stop at
all."

2/  While Petitioner's Complaint sets forth violations of the
Americans with Disabilities Act and Section 504 of the
Rehabilitation Act of 1973, Petitioner did not raise said
allegations in the parties' Joint Pre-hearing Stipulation and
does not address the same in Petitioner's Proposed Final Order.
Said allegations are deemed abandoned.

COPIES FURNISHED:

LaKisha M. Kinsey-Sallis, Esquire
Fisher & Phillips LLP
Suite 2350
101 East Kennedy Boulevard
Tampa, Florida  33602
(eServed)

Ann Marie Cintron-Siegel, Esquire
Disability Rights Florida
Suite 104
1930 Harrison Street
Hollywood, Florida  33020
(eServed)

Megan Marie Collins, Esquire
Disability Rights Florida
Times Building, Suite 640
1000 North Ashley Drive
Tampa, Florida  33602-3716
(eServed)

Victoria Sears Gaitanis, Dispute Resolution Program Director
Bureau of Exceptional Education and Student Services
Florida Department of Education
Turlington Building, Suite 614
325 West Gaines Street
Tallahassee, Florida  32399-0400
(eServed)

Matthew Mears, General Counsel
Department of Education
Turlington Building, Suite 1244
325 West Gaines Street
Tallahassee, Florida  32399-0400
(eServed)

Jeff Eakins, Superintendent
Hillsborough County Public Schools
901 East Kennedy Boulevard
Tampa, Florida  33602-3408

NOTICE OF RIGHT TO JUDICIAL REVIEW

This decision is final unless, within 90 days after the date of this decision, an adversely affected party:

a)  brings a civil action in the appropriate state circuit court pursuant to section 1003.57(1)(c), Florida Statutes (2014), and Florida Administrative Code Rule 6A-6.03311(9)(w); or

b)  brings a civil action in the appropriate district court of the United States pursuant to 20 U.S.C. § 1415(i)(2), 34 C.F.R. § 300.516, and Florida Administrative Code Rule 6A-6.03311(9)(w).