# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

A.B..

     **Plaintiff,**

v.                                   **Case No. 8:20-cv-00353-MSS-SPF**

**SCHOOL BOARD OF HILLSBOROUGH
COUNTY, FLORIDA,**

     **Defendant.**

_____/

## PLAINTIFF'S INITIAL BRIEF

Pursuant to the Court's order dated July 16, 2020, Plaintiff, A.B., respectfully submits her

initial brief. Plaintiff respectfully requests this Court review the administrative record[1] and find

that the Defendant's, School Board of Hillsborough County, refusal to provide home door[2]

transportation to Plaintiff violates the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400 *et. seq.*. As grounds therefor, Plaintiff states:

## I.    INTRODUCTION AND STANDARD OF REVIEW

This action is brough pursuant to the IDEA to review an order of the Division of

Administrative Hearings ("DOAH"), State of Florida, in an impartial due process hearing

conducted pursuant to 20 U.S.C. § 1415(f). In actions brought under the IDEA, the District Court

"(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence

---

[1] The administrative record was filed under seal. All filings and exhibits should be numbered in bold on the upper right-hand corner. This part of the record will be referred to as (R) followed by the bolded page number, ex: (R. _). Where possible, A.B. will cite to the specific paragraph within a page of the record, e.g.: (R._¶_). Citations to the administrative transcript (T) are to page and lines, e.g.: (T. _:_).

[2] As noted in the Joint Pretrial Stipulation, the Parties agree that "home door" transportation in this case means transportation that picks up and drops the Plaintiff off directly in front of the door of her home and does not require the Plaintiff to navigate to a bus stop at all (R. 134).

at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The standard of review is specific to consideration of administrative decisions under the IDEA. The Act envisions an independent ruling based on a preponderance of the evidence, with the majority of the evidence coming from the records of the administrative hearing. *Manecke v. Sch. Bd.*, 762 F.2d 912, 919 (11th Circuit. 1988). The extent of deference to be given to the administrative findings of fact is left to the discretion of the court. *Jefferson Cty. Bd. of Educ. v. Breen,* 853 F.2d 883, 857 (11th Cir. 1988), *citing Town of Burlington v. Dep't. of Educ. v. Com. Of Mass.*, 736 F.2d 773, 792 (1st Cir. 1984)., aff'd, 471 U.S. 359 (1985).

While district courts must consider the administrative findings of fact, they are free to accept or reject them. *Id*. n.2 (decision described as "bounded, independent decision … bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of evidence before the court."); *Town of Burlington*, 736 F.2d at 791. While a reviewing court must presume that findings of fact are *prima facie* correct, *see M.M. v. Sch. Bd. of Miami-Dade Cnty.*, 437 F.3d 1085, 1097 (11th Cir. 2006), a district court must accept the conclusions that are supported by the record but reject those that are not. *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1181 (11th Cir. 2014). Issues of law are reviewed *de novo*. *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1295 n.6 (11th Cir. 2000); see also, *Draper v. Atlanta Indep. Sch. System*, 518 F.3d 1275, 1284 (11th Cir. 2008).

Here, the Administrative Law Judge's ("ALJ") findings overlook evidence that support a finding under the requirements of the IDEA and well-settled case law interpreting the IDEA, that the Plaintiff requires home door transportation, and the failure on the part of the Defendant to

provide such transportation is violation of the Plaintiff's right to a free and appropriate public education ("FAPE").

## II.      STATEMENT OF FACTS

### A.  Nature of A.B.'s Disability and Impact on Transportation Needs

A.B.[3] is eligible for specially designed instruction and related services under the eligibility of Orthopedic Impairment and Language Impairment due to her disabilities which include spina bifida and visual impairments (R. 136 ¶¶ 3, 6). A Specialized Transportation Documentation form from an October 11, 2018 IEP meeting indicated that that A.B. requires specialized transportation because she uses parentally provided equipment (manual wheelchair); requires a bus ramp to gain entrance to and exit the bus; requires monitoring due to a shunt, a limited ability to walk due to her spina bifida, and urologic bladder/changing needs; requires an aide or monitor due to concerns about her inability to respond to safety directions and to communicate information about herself in an emergency situation (R. 338). According to A.B.'s treating physician, Dr. Lisa Anne Franceschini Wildcatt, MD, A.B.'s spina bifida with hydrocephalus has caused her to have paralysis of her lower limbs, and an inability to have bladder or bowel function, and cognitive delay (T. 12:11-15).

Although A.B. is 11 years old, Dr. Wildcatt testified that A.B.'s cognitive delay causes her to be cognitively "like a child who is about the age of five" (T. 12:20 -T. 13:13).  Dr. Wildcatt's assessment of A.B.'s cognitive abilities is supported by A.B.'s IEP dated March 7, 2019, which indicates that she is working on "pre-readiness skills" such as a knowledge of the alphabet, beginning letter sounds, pre-writing skills, and listening and following directions (R. 362). Additionally, A.B. was noted to be at an "emergent level identifying and matching

---

[3] Hereinafter, the Plaintiff will be referred to as "A.B." and the Defendant will be referred to as "District."

common environmental/safety signs" and "an emergent level giving her birth date with prompts

and cues." Her IEP indicated she can follow "very simplistic directions with visual, verbal, and

teacher modeling support." A.B.'s IEP further indicated that A.B. meets challenges counting

objects and identifying the amount 1-6 and rote counting to 20. *Id*. Dr. Wildcatt further testified

that A.B. presently relies on someone to take care of her at all times (T. 13:5-6).

A.B.'s fifth-grade teacher, Ms. Teresa Alexander, testified that her understanding of the

impact of A.B.'s disability, as far as the classroom, was that A.B. has "short-term memory

problems and her cognitive skills are limited" (T. 66:9-11). With regard to A.B.'s transportation

needs, Dr. Wildcatt testified that A.B. requires a bus with air conditioning because she can't

"ride a regular bus and face different elements like that, like weather. . ." (T. 14). Dr. Wildcatt's

assessment was that A.B. "is a kid who is not going to hang out at the side of the road and wait

for a bus. . . . she can't be by herself. . . she can't ride a hot bus" (T. 14:19-23).

Dr. Wildcatt explained A.B.'s 'temperature instability:

> if she gets hot, she's going to get overheated. If she gets cold, she's going
> to get cold. It's going to affect her core temperature differently than it would
> me or you, . . . it goes back to that brain development and her brain not being
> able to manage those type of things" (T. 15: 7-13).

Dr. Wildcatt specified that the concern for A.B. was specifically overexposure to the

elements. With regard to what constituted 'overexposure,' she explained "so you have to just

watch her carefully and make sure that she's not getting overheated or getting too cold when she

is exposed to elements" (T. 28:2-4). She stated that she could not quantify an amount of time

during which A.B. could be exposed to the elements because "it depends on the weather. It

depends on the heat index. And there is [sic] multiple variables" (T. 28:5-9; T. 28: 22-24). Dr.

Wildcatt distinguished the bus stop, where she believed A.B. would not be safe from the

elements, with the school campus, which was able to provide shelter because on a

4

school campus, as personnel saw things change, A.B. could easily be brought inside, whereas she doesn't have that ability while waiting for the bus. (T. 33).[4] Dr. Wildcatt elaborated on A.B.'s need for home door transportation:

> … you have a child who cannot navigate the parking lot by herself. She has to have someone . . . take her out and, you know, and she has to do the parking lot and - - and the sidewalk. And, you know, she has an expensive wheelchair. So, you know, you're exposing her to elements. It just makes sense - - she is a handicapped child. You know, we don't have parking handicapped spots way in the back of the parking lot (T. 19: 4-13).

Dr. Wildcatt testified that the letters entered as Petitioner's Exhibits 7 and 8 (R. 535 and 537) both continued to reflect her medical opinion. She also testified that the difference in the letters was the degree of thoroughness with which she explained A.B.'s medical condition and needs (T. 17-19). Even if precautions were taken to make the bus stop safer for A.B. (such as building a pavilion to protect her from the elements), she would still need to have a caretaker come out and help her and sit there and wait (T. 21).

Similarly, Dr. Wildcatt stated that having A.B. wait inside the house until the bus arrived would also fail to address all her concerns with A.B.'s medical conditions as she would still have to navigate the parking lot and the street to get to the bus stop (T 38:13-20). Importantly, A.B.'s physician clarified that this was specific to A.B. and that she did not hold the opinion that none of her patients who are wheelchair-bound could navigate parking lots. She stated that her opinion varied depending on a patient's function and their abilities (T. 36:6-16).

Similarly, A.B.'s parent testified that her concern with A.B.'s bus stop was not merely because A.B. is wheelchair bound but had to do with A.B.'s lack of knowledge of fight/flight and

---

[4] Incidentally, Dr. Wildcatt also stated that A.B. absolutely required an air conditioned bus and that an aide monitoring her temperature on a non-air-conditioned bus would not be sufficient because despite monitoring her, they would be unable to solve the issue overheating on a hot bus even if they became aware of it - the way they would be able to in a private vehicle.

stranger danger, her delays in development, her issues with vision, and her inability to recognize the weather, and inability to feel her lower extremities to know if she is hot or cold (T. 263).

Ms. Alexander's testimony also supports this:

> A: .... She's able to propel that chair. And she is able to propel it with supervision, whether a parent or an adult, to a designated location, for a short space.
> Q: And do you believe A.B. is able to appreciate dangers that she might encounter between her home and a bus stop?
> A: A.B. is not able to appreciate dangers.
> Q: Do you believe that A.B. requires adult supervision at the bus stop? A: She does.
> Q: Do you believe A.B. requires adult supervision to get to the bus stop? A: She does (T. 105:11-25) (emphasis added).

Laura Heckley, the ESE Specialist from A.B.'s elementary school, similarly stated that A.B. was unable to appreciate dangers that she might encounter between her home and the bus stop and that "based on the IEP and all the information that was provided by the teacher and those that worked with her, including [the] parent," A.B. was unable to be at the bus stop without adult supervision (T.159-160). A.B.'s paraprofessional for the 2018-2019 school year also stated that she believes A.B. requires adult supervision at all times based on her needs (T. 237:21-23).

Various witnesses also testified to A.B.'s difficulty or hesitancy to propel herself across changes in elevation of pavement on her own, and A.B.'s parent testified that the path to A.B.'s bus stop requires her to traverse two speed bumps (T. 255-256). A.B.'s parent shared that A.B. is a "routine learner" who, according to her parent, always picks the second of two options you give her and who memorizes routines and patterns rather than recognizing her own needs/surroundings (T. 251).

## B. Procedural History of the Development of the Individualized Education Plan in Dispute

A.B. has been a student within Hillsborough County since she was in Pre-Kindergarten.

(T. 241: 9-23). At the time of the hearing, A.B. was in the sixth grade (R. 137 ¶ 5). Since she was in Pre-Kindergarten and through approximately September 2018, A.B. lived in a home on a public road (T. 242: 1-12). Throughout the entire time A.B. lived at this home, the District picked her up from the end of the home's driveway (T. 242: 19-25; T: 243: 1-6). A.B.'s parent testified that "from day one," A.B. was picked up at the bottom of the driveway of her house (T. 243: 14). The distance she traveled from her home to the end of her driveway was about 20 feet (T. 253: 5-10). Ms. Alexander, A.B.'s 5th grade ESE teacher, testified that it was her understanding that prior to A.B.'s parent moving in the fall of 2018, A.B. had been receiving door-to-door transportation (T. 67-68). On approximately September 25, 2018, A.B. moved to an apartment complex that was not gated. (T. 243: 16-25).

The Individualized Education Plan ("IEP") in place for A.B. prior to her move on September 2018, and dated April 2, 2018, indicated that A.B. required specialized transportation to and from school daily due to her medical equipment (namely, her wheelchair). (R. 137 ¶¶ 8, 9). The Specialized Transportation Documentation Form ("Transportation From 1") completed at that meeting provide that A.B. requires a lift in order for her to gain access to the bus, that the A.B. uses a parent-provided manually operated wheelchair, and that A.B. required an aide or monitor on the bus because she is unable to communicate information about herself in an emergency situation. The Transportation Form 1 also indicated that A.B. requires adult supervision at the bus stop and that a parent or adult designee must be with A.B. at the bus stop. Transportation Form 1 does not mention "home-door" or "door-to-door" (R. 137 ¶ 10). Ms. Alexander stated that she understood that A.B. had a home-stop location at her prior address, even though her IEP did not indicate that she had door-to-door service (T. 82: 17-22).

Ms. Alexander stated that A.B.'s parent informed her, in the fall of 2018, that "she had recently moved, and that she had gotten some information that said that A.B. would no longer be picked up directly from the door" (T. 96:3-7). According to Ms. Alexander, A.B.'s parent shared that "she wanted the door-to-door service to continue, and that we needed to have something on this IEP stating that A.B. needed those services" (T. 96:19-22). This was because, as A.B.'s parent testified, she called Transportation about the new stop because it was a four-way stop sign and wasn't door-to-door (T. 244: 20-25) and the person she spoke to in transportation asked whether the service was on A.B.'s IEP and that she did not know but assumed so because A.B. had always had it (T. 245: 17-25).

The IEP team met on October 11, 2018 to discuss parental concerns regarding transportation (R. 138 ¶ 12). The IEP team did not make any changes to the related services section of the IEP in terms of transportation. That section continued to indicate that A.B. requires specialized transportation to and from school daily due to her medical equipment (namely, her wheelchair). The IEP team did, however, complete an updated Specialized Transportation Documentation Form ("Transportation Form 2"), which included the following new language,

> "[A.B.'s] parent recently moved to a new location and her mom is wanting to discuss [A.B.'s] need for the bus to pick her up directly from her new address. Mom is stating that transportation has issued her a bus stop that is not her home address. The bus stop the transportation offers to pick up [A.B.] is a block away and near a dangerous sign pathway … the IEP team agrees that [A.B.] needs to be picked up directly from her home door to ensure [A.B.'s] safety. (R. 138 ¶ 14)."

The only individuals present at the meeting were Ms. Alexander, Weichen Gai (who served as the Local Education Agency ("LEA") Representative at the meeting), and A.B.'s mother. There were no individuals representing the District's Transportation Department present at that meeting (R. 138 ¶ 15).

Ms. Alexander testified that at the October 11th meeting, the IEP team "agreed that A.B. should be picked up directly from her home, according to this form," (T. 71:11-14) referring to the transportation form. She reiterated, in explaining the transportation form attached to the IEP that "based on this, I guess the IEP team thought it was correct that she be picked up from her home" (T. 71:17-21). Notably, Ms. Alexander did not say that she merely documented the parents' wishes on the form. Rather, Ms. Alexander stated that "based on the information we were given by Ms. Ennis. . . we felt like she should be picked up directly from her home to ensure her safety (T. 97: 13-16). When questioned about her knowledge as to why A.B. had a stop location that was at her home door prior to her move and then a stop that was not her home door after her move, Ms. Alexander testified that as far as she could recall "it was maybe because of transportation guidelines" (T. 104:16-19).

A subsequent IEP meeting took place on January 25, 2019, which was convened to address the parent's safety concerns regarding A.B's bus stop location (R. 138 ¶ 16). The conference summary from that meeting indicates that A.B. "previously had door to door pickup at her previous residence." The meeting notes do not indicate that there was any discussion by the team of A.B.'s needs and/or changes to her needs that would warrant a change in her services, namely, the removal of the door to door transportation. Rather, the notes indicate that the discussion was centered around transportation policies regarding private roads and dead-end roads. The notes indicate that transportation representatives scheduled a time to meet with A.B.'s parent to "observe the transportation situation and AB's navigation to the current stop" (R. 345). This is supported by the testimony from Ms. Alexander, who stated that at that meeting, "there was a discussion

regarding Transportation and the policies regarding private road, safety, and dead-ends"

(T. 73:18-24). Ms. Alexander testified that she recalled there being a mention of the fact

that "due to the fact that it was private property, then that governed being picked up

directly from the door stop, possibly" (T. 74:8-12).

The District's ESE Resource Teacher, Renee Rybicki, attended the January meeting and

agreed to meet with the parent on a different date to review the stop location, to observe A.B.

navigating the bus stop, and to address the parent's safety concerns. That observation later

occurred on or about January 29, 2019 (R. 139 ¶ 17). Ms. Rybicki testified that in her

observation that A.B. did appear to need assistance going over a speed hump that was in the

parking lot on the path to her bus stop (T. 118: 15-21). She stated further that based on the

information provided that she believed A.B. needs a stop location that is "in close proximity to

the home location (T. 120). Ms. Rybicki stated that she based her determination that A.B. didn't

need home door transportation on "the absence of statements [in her IEP present levels] stating

that she requires that type and level of assistance" (T. 122: 16-24). She stated this, despite the

fact that, according to A.B.'s IEP present levels, she is at a pre-readiness academic level and

struggles with both independent functioning and communication and contain statements

regarding A.B.'s inability to navigate to or remain at her bus stop alone. *Supra* at 3.

Ms. Rybicki testified regarding her input regarding the safety of A.B.'s bus stop that her

"only responsibility when it comes to a [transportation medical information form] is to submit

what has been processed and sent to me from School Health Services and to make sure that

Transportation receives the copy that they are - - they need" (T. 114:11-16). Ms. Rybicki's

involvement in this case consisted primarily of her observing A.B. and her ability to access the

bus stop, to "look at her moving from point A to point B" (T. 115: 1-3). She stated that her position was "just to observe what was going on and reporting back on it" (T. 115:17-18).

A follow up IEP meeting was held on March 7, 2019 and at that meeting, the IEP Team did not make any changes to the related services section of the IEP in terms of transportation. That section continued to indicate that A.B. required specialized transportation to and from school daily due to her medical equipment (namely, her wheelchair). The IEP completed an updated Specialized Transportation Documentation Form ("Transportation Form 3"). The updated transportation form included the following new language, "[A.B.] requires a stop location in close proximity to her home." (R. 138 ¶¶ 18-20).

The conference summary from the March 7, 2019 meeting acknowledges that A.B.'s Specialized Transportation Documentation indicated that "the IEP team agrees A[B] needs to be picked up directly from her home door to ensure A[B]'s safety." The summary also indicates that this service stopped when A.B. moved from a home in a subdivision to an apartment complex "where a bus could not access the road" and that A.B.'s parent had concerns regarding traffic, lighting, and navigating A.B.'s wheelchair to the new bus stop in inclement weather. Ms. Rybicki and Mr. Warrington, Transportation Manager for Safety and Training, attended the meeting where they shared the findings from their review of the stop. The stop was located 253 feet from A.B.'s apartment[5] and transportation recommended that A.B. wait inside until the bus makes it to the area, rather than waiting at the stop, and use a poncho to avoid inclement weather (R. 349).

---

[5] The transportation review form (R. 349) indicated that the assigned bus stop was at Plantation Avenue, the private road in A.B.'s complex, and Providence Road, but that the bus was in practice stopping at the first entrance of the apartment complex on Plantation Avenue. The recommendation was that the assignment be changed to the stop Plantation Avenue and pursue a hold harmless agreement.

When questioned about A.B.'s bus stop location at the hearing, specifically why the bus couldn't drive into A.B.'s apartment complex, Mr. Warrington stated "we do not pick up or drop off students in parking lots." He stated that he was not aware of any way to get an exception made to that policy/procedure and that it was in the transportation handbook that they "do not pick up in apartment complexes, townhomes, or anything like that" (T. 186). Mr. Warrington further stated, in response to questioning about the circumstances where a student in a wheelchair won't have a home-door location for their bus stop, that this scenario might happen "in times where we physically cannot get the school bus to the residence or it goes against whatever policy or practice that the School District has in terms of stop locations" (T. 198: 8-20).

Ms. Alexcia Wiggins, the Supervisor for ESE transportation, similarly testified that a bus could not go into an apartment complex because "it's private property, and it's - - trying to maneuver through a parking lot in a bus, because it's going to be in a parking lot, that's usually not safe" (T. 206-207). Further, Ms. Wiggins stated that when she received an email in regard to the stop location, she "let them know, well she had a home stop, but she was in a home - - a actual house and moved to an apartment complex, and we couldn't get into the apartment complex" (T. 208:1-7). She said that while she reviewed the stop's distance and recommended it be moved to closer intersection, she didn't recommend that it be moved to the front of A.B.'s building because "it wasn't possible. It's down a private road and in a parking lot" (T. 208:12-15). Ms. Wiggins testified that the District's practice is that if there were a concern with A.B.'s ability to access her bus stop, it would be the parent responsibility to get the student from her home to the stop (T. 208: 25-209:3). She also stated that if A.B.'s parent in particular requested a stop at the front door

and it wasn't safe based on the stop being in a parking lot, the request would be denied, and it would be the parent's responsibility to get the child to the bus stop (T. 211:7-20).

Although the team consulted with the Transportation department concerning the safety of the stop generally, the records do not reflect, and Ms. Alexander testified that she also had no knowledge, that any medical professionals were consulted regarding the safety of the stop specifically given A.B.'s unique medical conditions and needs (T. 74:20-25, 76:1-3). With regard to the medical information provided by A.B.'s doctor, Ms. Alexander testified that in her opinion "it definitely should be considered" in a discussion of A.B.'s transportation needs (T. 78:1-7). She testified further that if the district had information regarding A.B. needing to be limited to exposure to elements that information would have been "very highly" considered by the district. She stated it was "very important that we know that information" (T. 81:16-20). In spite of this, according to A.B.'s parent, when she shared a letter from A.B.'s physician with the district, she was told that it wouldn't change their position about door-to-door and that there was no need to meet about the letter (T. 247).

Importantly, the only safety review of the bus stop in this case was done by Ms. Rybicki and Mr. Warrington. Ms. Rybicki testified that her only responsibility was to look at A.B. moving from point A to point B. *Supra* at 10-11. Mr. Warrington testified that he did not take A.B.'s medical condition into consideration when he reviewed the safety of his bus stop, that he only applied the criteria used for bus stops and hazardous walking criteria that's located in Florida Statutes (T. 187). Mr. Warrington testified that if there were concerns with A.B.'s medical condition related to her bus stop, those would be handled through the school district ESE department, and as far as he knew, through Ms.

Rybicki (T. 187). Even Ms. Wiggins, the District Supervisor for ESE Transportation

testified that while she had reviewed A.B.'s bus stop, she was not aware of A.B.'s

medical conditions or of how her disabilities affect her (T. 2017: 19-25).

### III.    LEGAL FRAMEWORK AND ANALYSIS

District school boards are required by the "Florida K-20 Education Code"[6] to

"[p]rovide for an appropriate program of special instruction, facilities, and services for

exceptional students as prescribed by the State Board of Education as acceptable." §§

1001.42(4)(l) and 1003.57, Florida Statutes. The "Florida K-20 Education Code's"

imposition of such a requirement is necessary in order for the State of Florida to be

eligible to receive federal funding under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400 *et seq*. The IDEA ensures that all children with disabilities

receive a "free appropriate public education" ("FAPE") with emphasis on special

education and related services designed to meet their unique needs. 20 U.S.C. §1400

(d)(1)(A).

In enacting the IDEA, Congress sought to "ensure that all children with

disabilities have available to them a free appropriate public education that emphasized

special education and related services designed to meet their unique needs and prepare

them for further education, employment, and independent living." 20 U.S.C. §1400

(d)(1)(A); *Phillip C. v. Jefferson Cnty. Bd. of Educ.*, 701 F. 3d 691, 694 (11th Cir. 2012).

The statute was intended to address the inadequate educational services offered to

children with disabilities. 20 U.S.C. §1400 (c)(2). To accomplish this objective, the

federal government provides funding to participating state and local agencies which is

---

[6] Chapters 1000 through 1013, Florida Statutes.

contingent on the agency's compliance with the IDEA's procedural and substantive

requirements. *Doe v. Alabama State Dep't of Educ.*, 915 F. 2d 641, 654 (11th Cir. 1990).

The IDEA's FAPE mandate is found in 20 U.S.C. §1401(9), which provides that districts

must provide students with:

> [S]pecial education services that -
> (A) have been provided at *public expense, under public supervision and
> direction, and without charge*;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary
> school education in the State involved; and
> (D) are provided in conformity with the individualized education program
> required under 20 U.S.C. §1414(d).

20 U.S.C. §1401 (9)(emphasis added).

Under the IDEA, a "free appropriate public education" ("FAPE") consists of

"special education" and, when necessary, "related services." *See* 20 U.S.C. § 1401(9).

The term "related services," as used in the IDEA, includes "transportation."20 U.S.C. §

1401(26)(A); *See also* 34 C.F.R. § 300.34. The IDEA ensures a FAPE for each child

through the requirement that districts develop and implement an IEP. 20 U.S.C.

§1401(9)(D); *Sch. Comm. Of Burlington v. Dep't of Educ.*, 471 U.S. 359, 368

(1985)("The modus operandi of the [IDEA] is the . . . IEP.")(internal quotation marks

omitted).

Districts also have an obligation under the IDEA to ensure "that the parents of

each child with a disability are members of any group that makes decisions on the

educational placement of their child." 20 U.S.C. §1414(e). Further, parents and children

with disabilities are accorded substantial procedural safeguards to ensure that the

purposes of the IDEA are fully realized. *See Bd. of Educ. Of Hendrick Hudson Cent. Sch.

Dist. v. Rowley*, 458 U.S. 176, 205-06 (1982). Among other protections, parents are

15

entitled to the right to be involved in the educational placement of their child and to file an administrative due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child." 20 U.S.C. §1415(b)(1), (b)(3), (b)(6).

Under the IDEA, parents with "complaints with respect to any matter relating to . . . the provision of a free appropriate public education" must have an opportunity to have their complaint heard "by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f). In Florida, pursuant to section 1003.57(1)(b), Florida Statutes, such complaints must be heard by a DOAH administrative law judge, who may award appropriate relief if a denial of FAPE is found. *See Forest Grove Sch. Dist.*, 129, S. Ct. at 2494 n.11; and *L.M.P. v. Fla. Dep't of Educ.*, 345 Fed. Appx. 428, 431 (11th Cir. 2009). A.B. bears the burden of proof with respect to each of the issues raised herein. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

The existing case law is clear that if a student's unique needs require that the Board provide transportation to the student then the Board is obligated to provide transportation to that student in a way that meets the student's needs. *See ** v. Broward County School Board*, DOAH Case No. 13-0577E, http://www.fldoe.org/core/fileparse.php/10992/urlt/13-0577redacted.pdf. The Eleventh Circuit has held that the relevant factors determining whether a child needs transportation as a related service include: (1) his or her age; (2) the distance he or she must travel; (3) the nature of the area through which the child must pass; (4) his or her access to private assistance in making the trip; and (5) the availability of other forms of public assistance

in route, such as crossing guards or public transit. *Donald B. v. Board of School Commissioners of Mobile County, Alabama*, 117 F.3d 1371, 1375 (11th Cir.1997). These factors indicate the analysis is a highly individualized one based on the unique circumstances of the child.

Other jurisdictions have held that a student is entitled to door-to-door transportation as a related service if the child does not appreciate dangers they might encounter between his or her home and the bus stop. *Fort Sage Unified Sch. Dist. V. Lassen County Office of Education*, 23 IDELR 1078 (SEA CA 1995). In *Fort Sage*, the Court found that an eleven-year-old student with an intellectual disability who was functioning at a kindergarten or first grade level was entitled to door-to-door transportation.

In that case, the student had always received door-to-door bus transportation prior to the year in question, although, according to the court in that case, it was "not clear whether his IEPs provided for transportation as a related service." *Id*. The court found in that case that due to the student's developmental disability, he did not appreciate the dangers he might encounter while walking between his home and the bus stop. In addition, the court noted that the student should not be left waiting at the bus stop without adult supervision. *Id.*

The tribunal in *Fort Sage* also opined that an unofficial school board policy that did not allow school buses to travel on dirt roads denied the ESE student transportation as a necessary related service *See Id. See also Los Angeles Unified Sch. Dist*., 48 IDELR 83 (SEA CA 2007)(holding that even though the Board could not safely maneuver a school bus on a narrow, unpaved road on which an ESE student's home was located, the Board

still was required to provide the student door-to-door transportation because that met the student's needs and a wheelchair-accessible van could be an option); *Shrewsbury v. Bd. of Education*, 265 SE.2d 767 (W. Va. 1980)(holding that the Board was still required to provide transportation to students even though there was evidence that the road used could prove "somewhat dangerous" for an average school bus to traverse and the Board owned only one small bus. These were not legitimate defenses); *Norton Sch. Dist.* 21 IDELR 974 (SEA VT 1994)(holding that the Board must provide alternate means of transportation if the Board feels that its school bus cannot go to the student's home and turn around in her driveway and that a district's failure to obtain a medical evaluation of the student's need for transportation services was an IDEA violation); *Kennedy v. Bd. Of Education*, 557 IDELR 232 (W. Va. 1985) (determining that the school board could not escape its obligation to provide transportation to ESE students because of its safety concerns related to the poor conditions of the road on which the students lived).

In *Fort Sage*, *Los Angeles Unified Sch. Dist*, *Shrewsbury*, *Norton Sch. Dist.,* and *Kennedy*, the district could not refuse door-to-door transportation based on district policies/practices that prevented school buses from going down certain roads. Similarly, in this case, the District cannot rely on its policy/practice of not sending buses into a student's apartment complex as justification for its refusal to provide A.B. with door-to-door transportation.

The facts in this case are clear that the District's policies took precedence over A.B.'s needs. The most telling evidence that A.B. required home-door transportation is the fact that A.B. had received home door transportation since she was in Pre-K. When she relocated in September 2018, the District sought to minimize her needs for the sake

18

of administrative convenience, which is supported by the facts that the District's

transportation policies took priority at the January 25, 2019 IEP meeting, *Supra* at 9-10,

and that the transportation department admittedly did not consider A.B.'s medical needs

when it reviewed the safety of the bus stop in question and made its recommendations

*Supra* 11, 13-14. Most notably, after the parent shared a letter from A.B.'s physician with

the District, she was told that it wouldn't change their position about door-to-door and

that there was no need to meet about the letter. *Supra* at 13. The ALJ overlooked this

significant evidence in error.

Furthermore, the ALJ's finding that A.B. "suffered no adverse health

consequences as a result of [her] exposure to the elements while awaiting the bus or

returning from the bus stop to home" (R. 247, ¶ 50) overlooked the abundance of

evidence of A.B.'s multiple health concerns, issues with body temperature regulation,

and expensive medical equipment, that make her more vulnerable to exposure to extreme

weather conditions. Even if no adverse health effects had occurred during the period of

time A.B. was not provided with home door transportation, A.B.'s physcian indicated a

foreseeability of future harm that may occur due to A.B.'s vulnerability to extreme

weather conditions (especially in Florida (T. 23; 8-11) in her letters and testimony.

The evidence from A.B's doctor, mother, and District staff that A.B. cannot

access the bus stop on her own based on the distance, functional limitations, and inability

to appreciate the dangers around her is relatively undisputed and clear. Indeed, A.B.'s

mother did not indicate any problems with her availability to push A.B. 253 feet to the

bus stop from her home. Nevertheless, in considering the factors from *Donald B*., the

evidence supports that it is unsafe for A.B. to make the 253 feet journey to and from the

stop every school day based on her medical vulnerability, which tips the balance of the relevant factors in favor of providing her with home door transportation. See *In re Student with a Disability*, 60 IDELR 84 (SEA NY 2012) (district court affirmed the IHO's decision that child was entitled to door-to-door transportation despite the parent's availability to walk with the student to school because his disability made it unsafe to walk to school).

Further, it is worth noting that other jurisdictions have held that if a child requires adult supervision at the bus stop as a part of his or her specialized transportation, schools generally cannot rely on parents to accompany and wait with their children at the bus stop. *See In re: Sara S.*, 507 IDELR 308 (SEA MA 1985). In *In re: Sara S.*, the court found that a district could not expect the parents of a 16-year-old student with down syndrome to accompany her in order to make it safe for her to traverse an otherwise unsafe path to her assigned bus stop. In fact, the court in that case held that the district's position was "wholly untenable and without legal justification. *Id.* This holding is in line with the IDEA's mandate that the education provide to a student be "provided *at public expense*, *under public supervision and direction*, *and without charge*." 20 U.S.C. §1401 (9)(emphasis added). In *Maynard Sch. Dist.*, 20 IDELR 394 (SEA AR 1993), the court considered the IDEA's protections for students who require transportation as a related service and found that "it is not the responsibility of parents to make necessary transportation accommodations, unless they desire and voluntarily do so." *Id.* As the court stated in *Anchorage School District*:

> While it is true the guardians could hire somebody to push [the student] home from the curb every day, this consideration is not persuasive. Financial considerations aside, a disabled child's parents *always could* hire somebody to *complete* the *entire* transportation transaction. Basically, what

the hearing officer did was to conclude that the district must complete the transportation transaction. Leaving [the student]. in the driveway or at another supervised location does not do that. Given the facts and circumstances here, door-to-door service is the only option in the record which allows [ ] to enjoy the benefit of his special education.

*Anchorage School Dist. V. N.S. ex rel. R.D.*, Case No. 3:06-cv-264 JWS 2007 8058163 (D. Alaska Nov. 8, 2007) at \*9 (emphasis in original).

Although the District has provided some degree of specialized transportation in this case, the transportation that District has provided to the A.B. is not appropriate to meet her needs.

## IV.    CONCLUSION

For the reasons set forth above, this Court should reverse the ALJ's final order and declare that Plaintiff's current IEP fails to provide a FAPE and order the Defendant to provide home door transportation; declare that the Plaintiff is the prevailing party and entitled to an award of reasonable costs and attorney's fees pursuant to 20 U.S.C. 1415(i)(3); and award Plaintiff any and all other appropriate relief under the IDEA.

Dated October 29, 2020

Respectfully submitted,

/S/ Lauren Brittany Eversole
LAUREN BRITTANY EVERSOLE
Disability Rights Florida
2473 Care Drive, Suite 200
Tallahassee, FL 32308
FL Bar No. 120245
Email: laurene@disabilityrightsflorida.org
850-488-9071 Ext. 9702

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

electronically filed with the Clerk of the Court using the CM/ECF system, which will provide

notice to all parties of record on this day, October 29, 2020.

/S/<u>*Lauren Brittany Eversole*</u>
Lauren Brittany Eversole
