## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

A.B.,

   Plaintiff,

v.              Case No. 8:20-cv-00353-MSS-SPF

SCHOOL BOARD OF HILLSBOROUGH
COUNTY, FLORIDA,

   Defendant.
_____/

### DEFENDANT'S RESPONSE BRIEF IN OPPOSITION

  Defendant, The School Board of Hillsborough County, Florida (hereinafter "School Board"), by and through its undersigned counsel and pursuant to the Court's July 16, 2020 Case Management and Scheduling Order, hereby submits its Response Brief in Opposition to Plaintiff's Initial Brief (hereinafter "Brief") filed on October 29, 2020 [Dkt. 27].

  In this appeal, Plaintiff moves this Court to set aside the sound findings of the Administrative Law Judge (hereinafter "ALJ') in the proceedings below and award her home door transportation.[1] However, as set forth more fully herein, the ALJ correctly determined that the individualized specialized transportation Plaintiff received provided her a free and appropriate public education and that Plaintiff failed to meet her burden of demonstrating that she required home door transportation.  The ALJ made these determinations against the

---

[1]Plaintiff also seeks damages.  However, as the School Board argued in the proceedings below, Plaintiff has no such damages to recover. As pleaded herein, Plaintiff received her specialized transportation. There is no evidence in the record that the School Board charged her for that service, that Plaintiff missed school or some educational benefit on account of not receiving home door transportation or that Plaintiff was impacted in any way in using the specialized transportation provided by the School Board. Additionally, Plaintiff has not demonstrated that she has incurred any attorneys' fees and costs in the case. In fact, Plaintiff's advocate testified that Disability Rights of Florida provides their services free of charge. [See Transcript ("Tr.") at 296]. Based on the foregoing, the Court should deny Plaintiff's request for damages.

backdrop of undisputed record evidence that Plaintiff successfully accessed her specialized transportation for the entirety of the time period at issue.  Accordingly, the Court should affirm the ALJ's November 15, 2019 Final Order and deny Plaintiff's appeal in all respects.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Plaintiff seeks judicial review of the Final Order entered on November 15, 2019 by Administrative Law Judge Todd P. Resavage of the Division of Administrative Hearing (hereinafter "DOAH").  In the Final Order, Judge Resavage denied Plaintiff's Request for Due Process in its entirety. [Record (hereinafter "R.") at 251].  The issue presented for review is whether the ALJ properly determined that Plaintiff did not require home door transportation[2] to receive a free and appropriate public education (hereinafter "FAPE").[3]

## STATEMENT OF THE CASE

## I.    PRELIMINARY STATEMENT AND PROCEDURAL HISTORY

The instant appeal arises from administrative proceedings authorized under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.  Plaintiff initiated those proceedings on or about March 26, 2019, when she filed her Request for Due Process (hereinafter "Due Process Complaint") against the School Board.  In her Due Process

---

[2] See Plaintiff's Brief (page 1, n. 2) for the parties' stipulated definition of "home door" transportation.

[3] Related to this issue, the ALJ construed Plaintiff's Due Process Complaint to raise an issue of whether the School Board failed to implement her Individual Education Plan (hereinafter "IEP") from the period of October 12, 2018 through March 6, 2019, due to his finding that a transportation form completed at an IEP meeting determined that Plaintiff should be picked up from her home door. [See R. at 248-250].  The School Board disagrees with this finding because, as several District witnesses credibly testified, this language was not intended to change Plaintiff's bus stop or to indicate that Plaintiff required home door services.  [Tr. at 71, 190, 210].  Rather, the intent was to communicate that Plaintiff required a stop that was in close proximity to her home and that was safe. [See Tr. at 44, 59].  The ALJ found that the School Board failed to implement that form but found that the failure was not a material deviation from Plaintiff's IEP resulting in a denial of FAPE. [See R. at 250].  Plaintiff neither specifically raised that as an issue on appeal in her initial filing in this matter nor in her Brief.  Therefore, that issue is not before the Court on review.

Complaint, Plaintiff alleged that the School Board denied her a FAPE "when it stopped providing, and subsequently removed, her related service of "home door" transportation from IEP . . ." [R. at 11]. Plaintiff asserted that, by purportedly taking such action, the School Board violated the IDEA, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.[4] The School Board filed its Response and Defenses to Complaint for Due Process on April 5, 2019. [R. at 22-29]. Therein, the School Board denied Plaintiff's claims in their entirety. [See id.] More specifically, the School Board denied that Plaintiff's IEP Team ever determined that Plaintiff required "home door" transportation or stopped such service and denied that Plaintiff required such form of specialized transportation to receive a FAPE. [Id., at 22-26]. The School Board also asserted several affirmative defenses. [Id., at 27].

On April 17, 2019, Plaintiff sought summary judgment or, alternatively, judgment on the pleadings (hereinafter "Motion"). [R. at 34-67]. The School Board filed its response in opposition to the Motion (hereinafter "Response") on April 24, 2019. [R. at 68-74]. In its Response, the School Board retorted that there existed several factual issues that rendered summary disposition unwarranted. [R. at 70-72]. The ALJ agreed and denied Plaintiff's Motion by Order dated April 25, 2019. [R. at 75-76].[5]

After a mutually agreed upon abeyance of the matter, a final hearing was held on August 29, 2019. During the hearing, the School Board's exhibits 1-25 were admitted into evidence. [Tr. at 107]. Additionally, Plaintiff's exhibits 1 and 5-8 were also admitted into

---

[4] The ALJ found that Plaintiff abandoned her ADA and Section 504 claims. [R. at 25, n. 2]. Plaintiff does not challenge that finding here.

[5] Plaintiff never challenged that ruling and does not contend here that the ALJ erred in denying her Motion.

evidence.  [Tr. at 18, 20, 125-126, 291].  Several witnesses also testified at the hearing, most of whom worked for the Hillsborough County Public School District (hereinafter "District") during the relevant time period.[6]  Following the conclusion of the proceedings, the parties submitted proposed final orders.  [See R. at 158-223].  The ALJ entered his Final Order on November 15, 2019, and this appeal followed on February 13, 2020.[7]

## II.   RELEVANT FACTUAL BACKGROUND

A.B.[8] is a student with a disability as that term is contemplated under the IDEA. [R. at 136, ¶ 1; R. at 229].  At all relevant times, A.B. was enrolled in the District as a fifth-grader at Symmes.  [R. at 136-137, ¶¶ 2, 4; R. at 229].  According to medical information A.B.'s parent provided to Symmes, A.B. has been diagnosed with spina bifida, which causes paralysis of A.B.'s lower limbs, and has certain visual deficits, a neurogenic bladder, and a ventriculo-peritoneal shunt, which keeps fluid from reaching her brain.  [R. at 137, ¶ 6; Tr. at 12-13; R. at 229].  Also, A.B. uses a wheelchair for mobility.  [R. at 137, ¶ 7; R. at 229].  Due to her disabilities, including a significant cognitive disability, A.B. was eligible for/received ESE services including specially designed instruction and related services under the eligibility categories of Orthopedic Impairment and Language Impairment.  [R. at 136-137, ¶ 3; R. 229].

---

[6]The witnesses included Dr. Lisa Wildcatt, Plaintiff's pediatrician; Wiechan Gai, Plaintiff's former Exceptional Student Education (hereinafter "ESE") Teacher and former paraprofessional at Symmes Elementary (hereinafter "Symmes"); Teresa Alexander, Plaintiff's former ESE Teacher at Symmes; Renee Rybicki, District Resource Teacher and Transportation Liaison for ESE; Laura Heckley, ESE Specialist at Symmes; Estelle Wolfman, District Staffing Coordinator; Jamie Warrington, the District's Manager for Safety and Training; Alexcia Wiggins, Supervisor for ESE Transportation; Plaintiff's mother; Suzette Sample, the District's Assistant Director for Compliance and Staffing, Special Education; Teaira Williams, Plaintiff's paraprofessional at Symmes; and Selina O'Shannon, Senior Advocate with Disability Rights Florida and representative for Plaintiff and her parent. [See Tr. at 10, 40-41, 49, 65, 86, 108, 138,152-153, 165, 180, 192, 203, 217, 219-220, 240, 269, 274, and 287].

[7]The notice of appeal was not formally filed with DOAH until July 23, 2020.

[8] For the ease of the reader, Plaintiff will be referred to as A.B. throughout this section.

A.B.'s teachers and paraprofessional—Ms. Gai, Ms. Alexander, and Ms. Williams (all of whom have worked with or have otherwise been familiar with A.B. since she first started attending Symmes as a pre-kindergartener)—all credibly testified regarding their personal observations of A.B. [See e.g., Tr. At 79-80, 221-222].  Relevant to the issue on appeal, they collectively testified that, although A.B. has physical impairments, she could mobilize herself, propel herself in her wheelchair, and aid in her daily toileting routine by wheeling herself into the bathroom, removing herself from the chair onto the changing table, and unfastening her undergarments. [Tr. at 222-227].  With respect to her communication skills, while A.B. was reported to have delays, she was observed to exchange greetings with peers and adults and engage in other limited conversations.  [Tr. at 222-223, 238].  It was also noted that, although A.B. could not fully appreciate dangers, she could advocate for herself or others.  [Tr. at 223-225, 237].  Further, A.B. could express when she wanted something, point out when her items were displaced, or tell the teacher when something was wrong with a peer. [Tr. at 223-225].

With respect to A.B.'s mobility skills, Ms. Gai, Ms. Alexander, and Ms. Williams all testified that A.B.'s ability to propel herself increased over the years.  [Tr. at 50, 54, 60-61, 237].  In fact, the testimony regarding the increase in A.B.'s mobility skills is consistent with the information reflected in the present level of performance sections of A.B.'s various IEPs. [See e.g., R. at 270, 290, 312, 333, 362, 381; Tr. at 52-55, 89-90, 92-93, 95].[9]  At school, A.B.

---

[9] For example, A.B.'s 2016 IEP stated that, "[A.B.] continues to become more independent . . . [s]he is able to ask for help[,] . . . move from her seat on the carpet and drag herself in the direction of her wheelchair.  [A.B.] uses a wheelchair to navigate around the classroom as well as the school campus.  She is able to propel and push herself, but maximum prompting is needed for her in order to get from one place to another in a timely manner." [R. at 270].  A.B.'s 2017 IEP stated that, "[A.B.] continues to become more independent by being more verbal, such as when being asked to be taken out of her wheelchair when appropriate.  Also, [A.B.] will move from her seat on the carpet being able to drag herself to the direction towards her wheelchair . . . Additionally, she will continue to ask an adult to sit down with her when completing tasks at the table . . . [A.B.] is very helpful [with

could propel herself around the campus going between the classroom, lunchroom, library, playground and other locations on the school grounds.  [Tr. at 63, 90-91, 225, 228].  Although she did not move fast, A.B. could go from point A to point B on her own.  [Tr. at 225].  The only time A.B. would rely on adult assistance was when she needed to clear non-flat surfaces like the high elevations around the school campus.  [Tr. at 226, 235].  And, in those instances, A.B. would stop her chair and say, "hey, I need help." [Tr. at 226].

A.B. participated in indoor and outdoor school activities around campus including the recess, the school's fun run, field day, Special Olympics, pep rallies, school fundraisers, and other activities that occur outside on the playground.  [Tr. at 85, 227-229].  A.B.'s parent was aware that A.B. participated in indoor and outdoor activities while at school.  [Tr. at 259].  In the community, A.B. attended outdoor activities such as birthday parties, went on vacations, went to church, visited Disney World, and shopped at grocery stores and malls, and was able to propel herself to get around while at these places.  [Tr. at 231, 257-259].  On a typical school day, A.B. would arrive on the bus where either Ms. Williams or Ms. Alexander would meet her at the bus ramp.  [Tr. at 232].  A.B. then wheeled herself into the cafeteria, picked out her choice of breakfast items, and wheeled herself to her table to eat.  [Tr. at 233].  After breakfast, A.B. would roll herself to the classroom to start her school day and then roll herself to and from specials such as music or art.  [Tr. at 233-234].  At the end of the day, A.B. would propel

---

her toileting routine] . . .  She is able to maneuver & roll her chair to propel it into the bathroom. [A.B.] can move her wheelchair beside the changing bed . . . [A.B.] uses her wheelchair to navigate around the school campus, including the classroom.  However, her wheelchair was recently updated to a bigger chair.  While she feels secure pushing herself within the classroom; she seems a little anxious about propelling her chair up an incline, maneuvering her chair long distances, rolling over separations between the sidewalks and transitioning smoothly around campus . . . [A.B.] also does well maneuvering around within her classroom." [R. at 290].

herself to the bus pickup area.  [Tr. at 234-235]. Throughout her time in the District, A.B. had IEPs that reflected that she required specialized transportation as a related service.  [See e.g., R. at 275, 294, 316, 336, 366, 386].  That information is documented on A.B.'s IEPs under the "Related Services" section, which is where the provision of home door services would be documented if a student needed it. [See e.g., Tr. at 131, 279].

**April 2, 2018 IEP**

A.B. had an IEP dated April 2, 2018. [R. at 161, ¶ 8; R. at 307-318]. The April 2nd IEP indicated that A.B. required specialized transportation to and from school daily due to her medical equipment (namely, her wheelchair). [R. at 161, ¶ 9; R. at 316].  The IEP did not reflect that A.B. required home door transportation.  [See R. at 316].  With respect to A.B.'s independent functioning at that time, according to that IEP,

> [A.B.] is able to maneuver & roll her chair to propel it into the bathroom. [A.B.] can move her wheelchair beside the changing bed . . . [A.B.] feels secure pushing herself within the classroom.  [S]he seems a little anxious about propelling her chair up an incline, maneuvering her chair long distances, rolling over separations between the sidewalks and transitioning smoothly around campus . . . [A.B.] also does well maneuvering around within her classroom.

[R. at 312].  The Specialized Transportation Documentation Form (hereinafter, "Transportation Form 1") completed at that meeting and that A.B.'s parent signed, provided that A.B. required a lift in order for her to gain access to the bus, that A.B. used a parent-provided manually operated wheelchair, and that A.B. required an aide or monitor on the bus because she was unable to communicate about herself in an emergency. [R. at 161, ¶ 10; R. at 231, 321].  The Transportation Form 1 also indicated that A.B. required adult supervision at the bus stop and that a parent or adult designee must meet her at the bus stop.  [Id.; Tr. at 106]. Transportation Form 1 does not mention "home door" transportation.  [R. at 161, ¶ 10].

7

At the time Transportation Form 1 was completed, A.B. lived in a house that was not in a gated-community or located on a private road.  [R. at 161, ¶ 11; Tr. at 241-242; R. at 230]. Therefore, based on her address, the District was able to assign A.B. a home stop location, where A.B.'s parent would take and retrieve A.B. to/from the end of her driveway for bus pick up and drop off. [R. at 161, ¶ 11; Tr. at 242-243].  At some point before/early in the 2018-2019 school year, A.B. relocated to an apartment complex in a gated community.  [R. at 161, ¶ 11].

**October 11, 2018 IEP Meeting**

An IEP meeting was held on October 11, 2018, solely to address parental concerns regarding the location of A.B.'s bus stop. [R. at 138, ¶ 12; Tr. at 42, 55, 66, 155; R. at 332]. At that meeting, the IEP Team did not make any changes to the transportation provision in A.B.'s IEP.  [R. at 138, ¶ 13; R. at 233, 337].  The IEP Team did, however, complete an updated Specialized Transportation Documentation Form (hereinafter, "Transportation Form 2") based on reports by A.B.'s parent that A.B.'s current bus stop was unsafe. [R. at 138, ¶ 13; R. at 233, 337-338].  Transportation Form 2 was amended to state, among other things, that

> Mom is stating that transportation has issued her a bus stop that is not her home address. The bus stop the transportation offers to pick up [A.B.] is a block away and near a dangerous sign pathway . . . the IEP team agrees that [A.B.] needs to be picked up directly from her home door to ensure [A.B.'s] safety.

[Id.].  The form otherwise remained largely unchanged.  [Id.; R. at 230-231].

In updating the form, Ms. Gai and Ms. Alexander were motivated by the parent's wishes and relied solely on A.B.'s parent's report about the bus stop including that the stop was at a very busy street, that A.B.'s parent had to push A.B. across the street, that it was "super unsafe," and that A.B. needed a pick up where there were not as many cars around.  [Tr. at 45, 58-59, 70-71, 84, 97, 102].  They did not know the actual circumstances of the stop, had

not observed A.B. navigating it, assumed the bus stop was unsafe, and believed there was no other alternative due to parent's report regarding there being only a private road to the apartment.  [Tr. at 44-45, 57-58, 97, 103].

**January 25, 2019 IEP Meeting**

A subsequent IEP meeting took place on January 25, 2019 to once again address parental concerns regarding A.B.'s bus stop.  [R. at 162, ¶ 16; Tr. 158, 167-169, 246; R. 235, 343-347].  Specifically, the IEP Team met to discuss the parent's concerns regarding safety, traffic, lighting, and inclement weather as it relates to A.B.'s bus stop location.  [Tr. at 158, 168; R. 235, 344].  Based on the information the IEP Team had available to them at the time, A.B. was safely getting to and from the current bus stop location and thus the Team felt A.B.'s specialized transportation was appropriate.  [See Tr. at 72, 159].  Nevertheless, it was agreed that a bus stop review would be conducted to observe A.B. navigating the bus stop and to address the parent's safety concerns. [R. at 139, ¶ 17; Tr. at 74; R. at 345].

**Bus Stop Review & The District's Relevant Transportation Policies/Practices**

The bus stop review occurred on or about January 29, 2019.  [R. at 139, ¶ 17; Tr. at 75, 114-115, 246; R. at 349].  Ms. Rybicki participated along with a representative of the Transportation Department—Jamie Warrington, the District's Manager for Safety and Training.[10] [Tr. at 114-115, 180, 184-185].  With respect to bus stops, Mr. Warrington credibly

---

[10] Mr. Warrington oversees all of the training for the Transportation Department and handles safety issues such bus crashes, accident investigations, and bus stop research.  [Tr. at 181].  Mr. Warrington is very knowledgeable in the area of transportation, has several years of experience—at least 28 years, and is an expert on the subject. [Tr. at 192].  In fact, Mr. Warrington previously served as the Director of School Transportation Management for the Florida Department of Education and draws on that experience when handling transportation matters in the District. [Tr. at 194-196, 199].

testified that in considering bus stops, the Transportation Department follows items like state guidelines and statutes, local policies, and national best practices.  [Tr. at 182, 187].  Also, the Transportation Department considers the safety of the students on the bus, the driver and the vehicle itself and tries to get bus stops as close as they can to the student.  [Tr. at 182].  When it comes to the assignment of a bus stop directly at a home (or other type of residence), Mr. Warrington testified that there can be physical limitations that prevent buses from picking up a student directly in front of their home such as narrow streets, lack of access, physical barriers, community gates, dead-end streets, or the unavailability of a place where a bus can safely turn around.  [See Tr. at 183].  As per District policy, buses do not pick up in parking lots or inside complexes (e.g., apartments or townhomes) due to safety concerns.[11]  [Tr. at 186, 206-207].

As it relates to a student with a disability, it is the IEP Team who determines a student's specialized transportation needs to ensure it is appropriately individualized.  [See Tr. at 112, 141, 188, 195, 209].  In addressing a student's need for specialized transportation, IEP Teams look at the whole student—their present independent functioning skills and health care needs, whether the student can ride a regular school bus or if they require something different, and

---

[11] At all relevant times, the District had policies and procedures that described transportation for disabled and non-disabled students and maintained a handbook on specialized transportation for ESE students.  [Tr. at 181-182, 204; R. 404-407, 523].  As a general matter, transportation is provided to students curb-to-curb.  [Tr. at 205; R. at 519-528].  The handbook referenced specifically states that,

> [u]nder most conditions, specialized transportation provides curb-to-curb service for students with disabilities.  This means that the buses will pick-up/drop off at the curb in a safe location relative to the student's residence of record or provider as appropriate. . . Due to road conditions ( . . . [including] condominium/townhouse/apartment complexes, dirt or gravel roadways, or narrow roadways), it may be necessary to pick up/drop off site at a safe location away from the home . . . Buses do not use private driveways or parking lots as pick-up/drop-off points.

[R. at 404-407].  The handbook further states that the bus driver or attendant is not responsible for escorting the student to or from the home and/or school.  [Id.]

what other supports a student may need (e.g., an aide) to be transported to school. [See Tr. at 119-120, 278].  If it is determined that a bus cannot meet a student's needs as determined on their IEP, other options are considered such as private transportation.  [Tr. at 184, 209].

Home stop locations are not unique to students with disabilities.  [Tr. at 47, 131, 196-197].  There are instances where non-disabled students also are assigned home stops such as when students are isolated, live in a rural area, would have to navigate a busy street to get to a bus stop or through ditches to get to a street, would have to walk a long distance, or where there are stops with no other students.  [Tr. at 128-129, 197].  Home stops would be provided to avoid the student having to navigate the identified hazard.  [Tr. at 199].  Also, there may be instances where a student in a wheelchair who does not have an IEP or for whom the IEP Team has not determined specialized transportation is required because the student can access a regular bus, may also be assigned a home stop.  [Tr. at 129, 198].

A.B.'s bus stop was initially routed for pick up/drop off at the end of Plantation View Avenue and Providence Road, which is a public right-of-way. [Tr. at 185; R. at 400-402]. Providence is a public road; Plantation View is a private road.  [Tr. at 185].  However, when Ms. Rybicki and Mr. Warrington conducted the bus stop review they discovered the bus was stopping on Plantation View. [Tr. at 185; R. at 236].  A.B.'s bus driver had not been authorized at that time to make that bus stop change but, because that location was in fact safer for A.B., Mr. Warrington recommended that the stop remain there and that the District pursue a hold-harmless agreement for accessing the private road—Plantation View. [Tr. at 185-186, 201; R. at 236-237].   Mr. Warrington, in collaboration with Ms. Rybicki, documented the results of the bus stop review on a Bus Stop Change/Safety Review Request. [Tr. at 117, 191; R. at 236,

349]. The report reflects that the bus stop is merely 253 feet from A.B.'s apartment door and is located as close as it could be to A.B.'s residence. [R. 237, 349]. Mr. Warrington and Ms. Rybicki also noted that, during the bus stop review, A.B. could successfully access her bus stop. [See Tr. at 118, 191; see also R. at 237, 349].

**March 7, 2019 IEP Meeting**

A follow up IEP meeting was held on March 7, 2019. [R. at 163, ¶ 18; R. 354-372]. Ms. Rybicki and Mr. Warrington attended the meeting as representatives of the Transportation Department. [Tr. at 186-187; R. at 359]. Ms. Rybicki and Mr. Warrington shared the outcome of their bus stop review and noted: (1) the apartment where A.B. lived had lights along the bus stop route that were not working but were recommended to be fixed; (2) the parent was told that, to avoid A.B. waiting outside for the bus, she could wait inside her home until the bus makes it to the area; (3) that it was recommended that A.B. use an appropriate poncho to avoid exposure to inclement weather; and (4) although the current stop remained on a private road, the stop would continue while a hold harmless agreement was being pursued. [R. at 356-357].

At that meeting, the IEP Team did not make any changes to the related services section of the IEP in terms of transportation. [R. at 163, ¶ 19; R. at 366]. The IEP Team did not change that section because the IEP Team again determined that A.B.'s specialized transportation remained appropriate. [Tr. at 75, 170; R. at 357]. The IEP Team did, however, complete an updated Specialized Transportation Documentation Form (hereinafter, "Transportation Form 3") to read "[A.B.] requires a stop location in close proximity to her home." [R. at 163, ¶ 20; R. at 370]. In updating this form, the IEP Team considered that A.B.

was able to ambulate for distances that were within the scope of her bus stop, provisions were made to address inclement weather, and the bus stop was safe. [Tr. at 171; R. at 357, 374].

**A.B. Successfully Accessed Her Specialized Transportation**

It is undisputed that, for the duration of the relevant time period, Plaintiff received specialized transportation to and from her school daily and successfully accessed the bus using the contested bus stop throughout the 2018-2019 school year.  [R. at 163, ¶ 21; Tr. at 202, 213-214, 235-236, 256, 260, 264]. Several witnesses familiar with A.B. testified that the specialized transportation as provided to A.B. was appropriate to meet her needs and that A.B. does not require door-to-door services.  [See e.g., Tr. at 102, 105, 161].

## STANDARD OF REVIEW

As Plaintiff states in her Brief, the Court's jurisdiction to hear this matter and the scope of review are outlined in the IDEA. [Brief, at 1-2].  The Court, while sitting in a "quasi-appellate" posture for purposes of this review, is required to respect the ALJ's findings since they were "thoroughly and carefully made." Cory D. v. Burke Co. Sch. Dist., 285 F. 3d 1294, 1297 (11th Cir. 2002).  Indeed, an administrative decision in an IDEA case "is entitled to due weight and the court must be careful not to substitute its judgment" for that of the hearing officer. Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett, 203 F.3d 1293, 1297 (11th Cir. 2000); Doe v. Ala. Dep't of Educ., 915 F.2d 651 (11th Cir. 1990).  As such, "administrative factfindings are [to be] considered . . . prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." Loren F. v. Atlanta Indep. Sch. Sys., 349 F. 1309, 1313 (11th Cir. 2003).

In the context of a challenge brought under the IDEA, the central question is whether a student's IEP is reasonably calculated to enable the student to receive educational benefits.  See

Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-207 (1982). The Supreme Court recently clarified that "to meet its substantive obligations under the IDEA, a school must offer an IEP reasonably calculated to enable a [student] to make progress appropriate in light of the [student's] circumstances." Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017). However, as the ALJ acknowledged below and as discussed in Endrew F., "the 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials," and that "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id. (emphasis in original). To that end, as courts have routinely stated, deference should be accorded to the reasonable opinions of the professional educators who helped develop the IEP. See id.; see also W.C. ex. rel Sue C. v. Cobb Cnty. Sch. Dist., 407 F. Supp. 2d 1351, 1360 (N.D. Ga. 2005) citing J.S.K. v. Hendry Cnty. Sch. Bd., 941 F.2d 1563, 1573 (11th Cir. 1991). Moreover, it has long been recognized that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993). Applying these standards to the case at bar, the Court should deny Plaintiff's appeal.

## ARGUMENT[12]

Plaintiff has pointed to no evidence that supports a finding that she required home door transportation or that not providing such form of transportation deprived her of a FAPE. And,

---

[12]The School Board notes that in the legal analysis section of Plaintiff's Brief, she raises the issue of a parent's procedural right to be involved in making decisions regarding the educational placement of their child. [See Brief, p. 15]. However, as Plaintiff did not raise any purported procedural violation related to the issue of meaningful parental participation in the IEP process, that issue is not properly before the Court and as such the School Board does not address that issue here.

most importantly, Plaintiff has failed to grapple with what the ALJ described as her failure to "present [any] evidence that, on any occasion, [she] was precluded or hampered from utilizing or accessing the specialized transportation that is necessary for [her] to enjoy the benefits of her special education." [See R. at 247]. The ALJ correctly found that the disputed specialized transportation was appropriate to meet Plaintiff's individualized needs and was reasonably calculated to enable Plaintiff to make progress in light of her particular circumstances. [See id.]. As such Plaintiff's misguided attempt to obtain a second-bite at the apple by asserting that the ALJ erred because he did not reach the same conclusion as other individualized holdings involving students with like circumstances, must be rejected.

The cornerstone of the IDEA is an "emphasis on special education and related services designed to meet [each] student's *unique needs*." [See Brief, p. 14 (emphasis added), citing 20 U.S.C. § 1400(d)(1)(A)]. Thus, to accept Plaintiff's invitation to adopt a categorical approach to determining whether a student needs "home door" transportation would be inherently inconsistent with the IDEA. The ALJ's ruling is reflection of that point and appropriately determined that Plaintiff did not require home door transportation to receive a FAPE. Consequently, the ALJ's Final Order should be affirmed.

### A.      Plaintiff's Specialized Transportation Provided Her a FAPE

The undisputed record evidence demonstrates that the specialized transportation that Plaintiff received from the School Board provided her a FAPE. Plaintiff's Brief correctly describes how FAPE is defined under the applicable law. [See Brief, p. 15]. As it relates specifically to this appeal, FAPE includes the provision of related services, which the IDEA defines as transportation and such developmental, corrective, and other supportive services as

are required to assist a child with a disability to benefit from special education. 34 CFR§ 300.34.  Transportation, for the purposes of the of the IDEA, includes— (i) travel to and from school and between schools; (ii) travel in and around school buildings; and (iii) specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.  Id.

As the Eleventh Circuit has explained, "the IDEA requires transportation if that service is necessary for a disabled child to benefit from special education."  Donald B. v. Bd. of Sch. Comm. of Mobile Cty, 117 F.3d 1371, 1374 (11th Cir. 1997).  The IDEA does not, however, mandate that such transportation be provided door-to-door nor does the IDEA explicitly define transportation as door-to-door services.  Fort Sage Unified Sch. Dist./Lassen Cty Office of Educ., 23 IDELR 1078 (Cal. SEA 1995).  Decisions regarding the related service of specialized transportation are left to the discretion of a student's IEP Team and are individualized to the student.  See Analysis of Comments and Changes to 2006 IDEA Part B Regulations, 71 Fed. Reg. 46576 (August 14, 2016); see also 34 C.F.R. § 300.320(a)(4).   And, as Plaintiff acknowledges in her Brief, in reviewing questions regarding specialized transportation, courts look at the following relevant facts and circumstances: (1) the student's age; (2) the distance she must travel; (3) the nature of the area through which the student must pass; (4) her access to private assistance in making the trip; and (5) the availability of other forms of public assistance in route, such as crossing guards or public transit. Donald B. By and Through Christine B. v. Bd. of Sch. Com'rs of Mobile City, Ala., 117 F.3d 1371 (11th Cir. 1997).  The ALJ looked at each of the relevant factors in arriving at his determination, which is supported by the record evidence.

1.      The <u>Donald</u> Factors Support Affirming the ALJ's Ruling

The determination that Plaintiff's specialized transportation provided her FAPE is saturated with undisputed law and facts that support affirming the ALJ's Final Order.  As a preliminary matter, there is no dispute between the parties that the case law is clear that at all relevant times the School Board was obligated to provide transportation to Plaintiff *in a way that met her needs* and that the <u>Donald</u> factors lead the Court down the individualized inquiry necessary in examine whether the transportation at issue met Plaintiff's needs.  [<u>See</u> Brief, p. 16-17].  There is also no dispute that Plaintiff has a cognitive disability and functions below grade/age level and that her ability to fully appreciate dangers and to respond appropriately in an emergency is impaired. [<u>See</u> id., p. 19].  For those reasons, there is also no dispute that Plaintiff requires specialized transportation, which she received [<u>See</u> <u>id.</u>, p. 21].  However, those factors do not necessitate that Plaintiff receive home door transportation. Those concerns have been addressed by requiring that Plaintiff's parent escort Plaintiff to the bus stop and by providing an aide on Plaintiff bus to be with her at all times. These strategies have been sufficient to meet Plaintiff's needs and Plaintiff cites no evidence to contradict that conclusion.

Regarding the distance Plaintiff has to travel and the nature of the area through which she must pass to access the bus stop, the undisputed record evidence demonstrates that Plaintiff has to propel her wheelchair no more than 253 feet (or .04 miles) to the bus stop, which the ALJ correctly determined was in a safe location and at the closest entrance to the apartment complex where Plaintiff lived. [<u>See</u> R. at 247, 349]. The undisputed record evidence also demonstrates that there were no hazards or other safety concerns that interfered with Plaintiff's ability to access the stop.  As to the final points—Plaintiff's access to private and public assistance in route—

17

those factors also favor finding that Plaintiff does not require home door transportation. Plaintiff's mother has been successfully escorting Plaintiff to her bus stop all year and, as the ALJ noted, Plaintiff presented no evidence below that Plaintiff's mother could not continue to assist and supervise Plaintiff while waiting for the bus to arrive. [R. at 247; Tr. at 249, 253, 260]. Plaintiff has had the provision of an aide all year to assist her once at the bus with onboarding and offboarding. These measures ensured Plaintiff's safe transport.

Plaintiff's attack on the School Board's policies as well as her reliance on Fort Sage Unified Sch. Dist., and the other similar cases cited, do not yield a different outcome with respect to the Donald factors.  Preliminarily, Plaintiff's claim that the School Board's "policies took precedence over [Plaintiff's needs]" and was the focal point of the Plaintiff's January 25, 2019 IEP meeting is simply not true and is not supported by the facts.  Regarding the substance of the claim, as the ALJ pointed out, states may prescribe their responsibility to provide transportation to disabled students on a case-by-case basis while considering the unique needs of the specific student.  [R. at 241].  Under the applicable Florida statutes, the School Board is required to maintain rules relating to the transportation of all students.  See § 1006.21, F.S.  The policies Plaintiff picks on merely serve their intended purpose but were not used to deprive Plaintiff of the specialized transportation she was entitled to.  As the facts detailed above show, the fact that Plaintiff (while living at a residential address) had a bus stop location at her drive way was not a function of any IEP determination and the fact that when she moved to an apartment complex the bus stop was located in close proximity to her home door was not due to administrative convenience as Plaintiff claims.  The IEPs at issue reflect that at all times Plaintiff's specialized

transportation needs were determined based on Plaintiff's individualized needs and functioning at that time.

The determination that the student in <u>Fort Sage Unified Sch. Dist.</u> required door-to-door transportation was similarly based on that student's individualized needs.  There, the student, who was cognitively impaired and had mobility issues, attended school in a district located in a fairly remote area and lived on a ranch in an "especially sparsely populated desert area" within the District.  <u>Id.</u>  The nearest bus stop to the student's home was approximately 12-13 miles away, approximately 2-3 miles from a private dirt road, and 10 miles from an unmaintained, rough and dusty county dirt road where there were wild horses, coyotes, and snakes.  <u>Id.</u>  The school district had a "unofficial policy" that it would not send buses on dirt roads and would not make exceptions for students with a cognitive disability regardless of his/her unique needs.  <u>Id.</u> Considering all these factors, the administrative law judge in that case determined that the student required door-to-door transportation.  Unlike the student in <u>Fort Sage Unified Sch. Dist.</u>, Plaintiff never had a bus stop that was miles long away from her home and that was too far for her to access even if accompanied by an adult, never faced the dangers of wild animals on the stop, and did not have the issue of encountering unmaintained, rough roads to access the bus stop.

Further, unlike the district in <u>Fort Sage Unified Sch. Dist.</u>, the School Board maintained no transportation-related policy that it refused to bend regardless of a student's circumstances. To the contrary, as Mr. Warrington testified "every student is different" as it pertains to those policies and transportation for disabled students is driven by the IEP as a related service.  [Tr. at 182].  And, even though the School Board policy was not to use a private road for a bus stop, Mr. Warrington testified that they permitted it for Plaintiff because it was in fact safer than her

19

original stop as routed and the District agreed to pursue a hold-harmless agreement to continue using that private road.  [Tr. at 185-186].  The fact that Mr. Warrington further testified that the District does not send buses into private parking lots is of no consequence because the bus stop that was provided to Plaintiff met her needs; there was no need to pursue alternate forms of transportation including home door transportation in order to enter the apartment complex parking lot.

In sum, as the ALJ found, the <u>Donald</u> factors support a finding that Plaintiff's specialized transportation was appropriate to provide her a FAPE.  Therefore, the Final Order should be affirmed.

### 2.    Plaintiff's Medical Conditions as Reported to the IEP Team Do Not Warrant Home Door Transportation

A large part of Plaintiff's appeal rests on her contention that her medical conditions warranted home door transportation despite the fact there was no evidence presented that proved that to be so. First, her medical conditions (with the exception of the wound vac) have been conditions that she has had during the entirety of her school career at Symmes. The educational professionals that worked with Plaintiff over the years have all been very familiar with her and considered her medical needs (as it was reported to them) as well as other things like her independent functioning in determining her special transportation as a related service. [See e.g. Tr. at 76, 78-80, 113, 153-154, 167, 176]. Neither Plaintiff's parent nor her attorneys or advocate ever presented medical information from a doctor related to her specialized transportation or claimed that such information was needed in order to fully consider her transportation needs until months after litigation was instituted. [See Tr. at 142-143, 176, 292- 294]. Additionally, Plaintiff's advocate in prior communications to the School Board never expressed Plaintiff's

medical condition was an issue; to the contrary, she only expressed that the parent wanted Plaintiff to be picked up from her home door because she is in a wheelchair. [See Tr. at 291]. Notably, neither Plaintiff's parent nor her attorney or advocate ever shared any information that she could not navigate the campus because of her medical condition(s). [See Tr. at 101, 231].

This whole notion of Plaintiff requiring home door transportation appears to be largely centered around the opinion of Dr. Wildcat that "[i]t is medically necessary for [Plaintiff] to receive direct home pick up at her front door." [See Brief, p. 19; R. at 535, 537]. Dr. Wildcat's recommendation was based on her opinion that Plaintiff is "a weaker person" who is "not like a regular kid" in that she cannot do "any activities of daily living [and] . . . relies on someone to take care of her at all times;" her belief that because Plaintiff is "wheelchair bound . . . she has to have someone push her out to the bus stop" and "cannot run out to the bus stop and get on the bus;" and her conclusion that Plaintiff "can't just ride a regular bus and face different elements like weather stuff . . ." [Tr. at 13-14, 19]. She did not think it was right that Plaintiff would have to "go through walking the parking lot, walking the sidewalk, sitting out in the rain or . . . the heat waiting for her bus." [Tr. at 20]. However, as the School Board argued in the proceedings below, Dr. Wildcat admitted that she was not sure if Plaintiff could navigate a parking lot; had not seen Plaintiff outside the clinical setting; had not observed Plaintiff access her bus stop or observed her moving around on Symmes's campus; had not restricted Plaintiff in any way from participating in community experiences and that, before this action, she had not entered any script indicating that A.B. could not be exposed to the elements. [Tr. at 22-23, 26, 30]. Dr. Wildcat admits that she assumed, but did not know, that traveling by bus did not provide the monitoring needed if Plaintiff was overexposed to the elements. [See Tr. at 35].

21

In challenging the ALJ's finding essentially that Dr. Wildcatt's opinion is undermined by the fact that Plaintiff "presented no evidence to establish that [she] suffered any adverse health consequences" by using the specialized transportation provided (see R. at 247), Plaintiff asks the Court to go out on a limb and find that it could happen based on Dr. Wildcatt's belief that there is a "foreseeability of future harm" if Plaintiff is not provided with home door transportation. [See Brief, p. 19]. However, that argument must fail for various reasons. First, Dr. Wilcatt conceded that her concern with Plaintiff's exposure to the elements is not one of ordinary exposure but overexposure; that she is not aware of the actual limits that Plaintiff can handle as far as weather is concerned; and that she had not received any report of Plaintiff reacting negatively to the elements. [Tr. at 28-29, 31]. Further, when informed that Plaintiff could propel herself around campus and participated in outdoor, unshaded school activities, Dr. Wildcatt expressed that she was not surprised. [Tr. at 31-32]. And, even more interestingly, Dr. Wildcatt shared that allowing Plaintiff to wait inside her home until the bus arrived at the bus stop, providing Plaintiff a ramp to access the bus, and ensuring that Plaintiff had an aide on the bus to monitor her status would resolve her concerns regarding Plaintiff's bus transportation. [Tr. at 33-34, 38].

Also, it is worth noting that there were consistent reports of Plaintiff participating in outdoor activities where she would be exposed to "the elements" without any noted difficulties. [See Tr. a 229]. The educational professionals working with Plaintiff reported that they had not observed Plaintiff reacting negatively to being out in the sun or cold and that Plaintiff's parent never reported that Plaintiff had any restrictions as it relates to her exposure to the elements. [Tr. at 81-83, 229-230]. It is also worth noting that Plaintiff's various health-related

documents on file with the District did not contain any information indicating that she could not be exposed to the elements or that she had such significant medical needs that she needed to be provided door-to-door transportation services.  [See e.g., R. 264, 323, 351-353, 498-505].

As a final note, the determination of whether Plaintiff required home door transportation must focus on Plaintiff's individualized needs as they presented themselves at the time the disputed IEPs were developed. See Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).  Dr. Wildcatt's opinion, and letters memorializing them, came to be *after* the due process proceedings begin.[13] Neither Dr. Wildcatt's opinion nor information of the like was ever presented to A.B.'s IEP Team during the 2018-2019 school year.  [Tr. at 160-161]. Indeed, at no time prior to the Due Process Complaint did her parent (or advocate) provide any medical information, script, or letter from A.B.'s doctor indicating that A.B. required home door transportation or suggest that there was a need to consult a medical professional on the issue.  [See Tr. at 160, 260].  Therefore, this information should have little to no bearing on determination before the Court and certainly should not outweigh the judgment of the educational professionals who worked with and were keenly aware of Plaintiff's needs/ abilities when they made their determinations regarding Plaintiff's specialized transportation.

### 3.  The Applicable Law Supports a Finding that Plaintiff's Parent Can Be Required to Accompany Her to the Bus Stop

The other aspect of Plaintiff's appeal appears to center around the notion that School Board is required to provide her with adult assistance to travel from her home door to the bus

---

[13] In fact, it is ever so clear that Dr. Wildcatt did not even have these opinions until asked by Plaintiff's parent or lawyer to draft a letter so that Plaintiff could "get[] her transportation." [See Tr. at 17].  Indeed, after Dr. Wildcatt wrote the first letter, she was implored to beef it up by Plaintiff's attorney because the first letter was "not enough." [Id. at 29-30]. Thus, Dr. Wildcatt's motivation for writing the letters is suspicious at best.

stop.  However, as the ALJ found (see R. at 244), that argument is inconsistent with applicable law.  First, Florida Administrative Code § 6A-3.0121, clearly states that, where the physical disabilities of the student render the student unable to get on and off the bus without assistance, the parent or guardian must provide the necessary assistance to help the student get on and off at the bus stop, as required by district policy or the student's individual educational plan. § 6A-3.0121, F.A.C. Thus, it is the parent's duty, not the School Board's responsibility, to escort Plaintiff to her bus stop. And, Plaintiff's parent has been informed of this at least yearly as required by law and she has acknowledged as such.

Plaintiff relies on In re: Sara S., 507 IDELR 308 (SEA MA 1985), Maynard Sch. Dist., 20 IDELR 394 (SEA AR 1993), and Anchorage Sch. Dist. v. N.S. ex. rel. R.D., Case No. 3:06-cv-264, 2007 WL 8058163, for the proposition that caselaw establishes that a parent cannot be required to assume such duty.  However, none of these cases represent such a holding.  Rather, in each of those cases, the courts made transportation determinations based on the individualized circumstances of the students in those cases as the Court should do here.   Moreover, Plaintiff cites no binding caselaw that supports the proposition that under the IDEA parents of disabled children cannot be required to provide adult supervision to and from bus stops or that the rules promulgated by the Florida Department of Education cited above are somehow inconsistent with the IDEA.  As such, the Court should dismiss Plaintiff's argument on this issue and uphold the challenged findings of the ALJ.

## CONCLUSION

The ALJ correctly determined that Plaintiff did not require home door transportation to receive FAPE and that Plaintiff failed to meet her burden to demonstrate otherwise.  The ALJ's

factual findings and conclusions of law that Plaintiff challenges in this appeal, are sufficiently supported by the record.  Accordingly, Plaintiff's appeal should be denied in all respects.

Respectfully submitted this 1st day of December, 2020.

/s/LaKisha M. Kinsey-Sallis
LaKisha M. Kinsey-Sallis
Florida Bar No. 78265
Fisher & Phillips, LLP
101 E. Kennedy Boulevard, Suite 2350
Tampa, FL 33602
Telephone: (813) 769-7500
Facsimile: (813) 769-7501
Email: lkinsey-sallis@fisherphillips.com
Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of December, 2020, a true and correct copy of the foregoing has been electronically filed with Clerk of the Court using the CM/ECF system, which will provide notice to all parties of record as follows:

Lauren Brittany Eversole, Esq.
Disability Rights Florida
Times Building
2473 Care Drive, Suite 200
Tallahassee, FL 32308
Email:  laurene@disabilityrightsflorida.org

Ann Marie Cintron-Siegel
Attorney for Petitioner
Disability Rights Florida
1930 Harrison Street
Suite 104
Hollywood, FL 33020
Email: anns@disabilityrightsflorida.org

/s/LaKisha M. Kinsey-Sallis
Attorney